CONNECTICUT GENERAL LIFE INS. CO. v. EATON, Internal Revenue Collector.

(District Court, D. Connecticut. October 27, 1914.)

No. 1709.

1. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—MUTUAL INSURANCE COMPANIES—PREMIUM "DIVIDEND."

Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300, 6301), imposes an annual excise tax on insurance companies equal to 1 per cent. of their net income above $5,000, such net income to be ascertained by deducting from the gross income, inter alia, "the sums other than dividends paid within the year on policy and annuity contracts." Held, that in case of a life insurance company, which, although a stock company, conducts a mutual department, but collects premiums

from the participating policy holders on the level premium plan, and at the end of the year, when the cost of carrying the policy has been ascertained, credits the policy holder with the excess paid, which he may have applied in reduction of the next premium, to purchase additional insurance, to shorten the premium-paying period of his policy, or to accelerate its maturity in case of an endowment policy, the surplus so applied is not a "dividend," within the meaning of the act, but represents nothing more than the excess of loading of the premium, which is returnable in some form to the policy holder.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, First and Second Series, Dividend.]

2. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—INSURANCE COMPANIES—"INCOME RECEIVED."

Items of "non-ledger assets," shown in the annual report of a life insurance company, made pursuant to a state statute, as "uncollected and deferred premiums" and "interest due and accrued," but no part of which had been received, were not a part of the company's "income received * * * during such year," within the meaning of, and taxable under, Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, § 6300).

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

3. WORDS AND PHRASES—"INCOME."

"Income" may be defined as the gain derived from capital, from labor, or from both combined.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

At Law. Action by the Connecticut General Life Insurance Company against Robert O. Eaton, as Collector of Internal Revenue for the District of Connecticut. Trial to court. Judgment for plaintiff.

Lucius F. Robinson, of Hartford, Conn., for plaintiff.

Francis H. Parker and Frederick A. Scott, U. S. Dist. Atty., both of Hartford, Conn., for defendant.

THOMAS, District Judge. In this action the plaintiff seeks to recover from the defendant certain taxes which it claims were illegally assessed against it under and by virtue of the provisions of the act of Congress approved August 5, 1909 (36 Stat. 112, c. 6, § 38 [Comp. St. 1913, §§ 6300, 6301]), entitled "An act to provide revenue, equalize duties and encourage the industries of the United States and for other purposes." The case was heard by the court without the intervention of a jury, in accordance with a stipulation entered into by the attorneys of record, wherein it was agreed that a jury be waived and the case determined by the court in accordance with sections 649 and 700 of the United States Revised Statutes. A finding of facts, in the nature of a special verdict, has been made by the court and filed with the clerk.

For a thorough understanding of this case it is essential to set forth, at the very beginning, a somewhat lengthy statement of the plan of operation adopted by the plaintiff in the conduct of its business, as

well as a statement of the claims of the parties and the facts disclosed by the evidence.

The Connecticut General Life Insurance Company was chartered by the General Assembly of Connecticut, by an act approved June 22, 1865 (5 Private Laws of Connecticut, page 693), and is a stock company doing a life insurance business on both participating (mutual) and nonparticipating plans. The charter provision of the company relating to these plans is contained in the fourth section thereof and reads:

"Policies may be issued, stipulated to be with or without participation in profits, and all dividends which shall be allotted to such participating policies which are not claimed and called for within two years after the same shall have been declared shall be forfeited to said company."

Plaintiff commenced business in October of the year it received its charter, and has since continued, with its main office at Hartford. For a number of years plaintiff has kept the accounts of the mutual and nonparticipating departments of its business entirely separate, so that the mutual policies do not now, nor have they for many years past, been contributing directly to any payments made to the stockholders of the company. The company has been operating on the so-called "level premium plan," which is the plan adopted by practically all of the large life insurance companies, "mutual" as well as "stock."

The level premium plan contemplates a uniform maximum annual contribution by the policy holder during the life of the policy, the amount of payment during the earlier years being in excess of the current cost of his insurance, and the excess being applied to the creation of a reserve fund, which serves to maintain the insurance in the later years, when the stipulated level premium would otherwise be insufficient to meet the current cost of such insurance.

In the case of nonparticipating policy holders, the premium is definitely fixed by the contract, while in the case of a participating policy holder a maximum premium is stipulated, with a contract provision for its annual reduction as determined by the company. The stipulated maximum premium in a mutual or participating policy is invariably greater than the fixed premium in a nonparticipating policy issued at the same age and upon the same terms, other than as concerns the insured's right of participation.

The plaintiff now conducts its participating or mutual department so as to secure to the participating policy holders their insurance at cost, and this result is accomplished by an annual reduction in the stipulated premium, the amount of such reduction being determined from year to year by the company.

The calculation of premium rates by a life insurance company involves, first, the adoption of a table of mortality showing the probable death rate for each age of life; second, the adoption of an assumed rate of interest, such as the company may reasonably expect to realize upon its invested assets during the lifetime of the policy. These two factors determine what is technically known as the "net"

or "mathematical" premium, and are the sums considered sufficient and necessary to pay all outstanding policies as they become claims, provided deaths occur exactly in accordance with the table of mortality adopted, and the rate of interest earned on the investment of the reserve fund proves to be exactly equal to the rate assumed. To the "net premium" there is then added a sum, technically known as "loading," for the purpose of meeting unforeseen contingencies, as also the necessary expenses of conducting the company's business.

Premium rates so computed have, in the experience of mutual life insurance companies, been generally found to be in excess of their requirements; but as such excess constitutes the margin of safety, and must be liberal, the stipulated rate must therefore be sufficiently large to insure, beyond peradventure, the company's ability to pay its claims as they accrue. Some of the policy contracts are likely to run for periods as long as 75 years, but the stipulated premium cannot be increased after once the policy is issued.

In the experience of the plaintiff, as with most other life companies, the actual death rate has been considerably lower than the expectancy shown in the table of mortality which was assumed in the computing of its stipulated premiums, and the interest rate which it has realized upon its investments has proved considerably higher than the assumed rate. The "loading" is also somewhat greater than that ordinarily required to cover the expense of conducting the business and to meet contingencies, and with the margin of safety involved each year has resulted in an excess of income over disbursements and the amount required to be set aside for increase of the so-called reserve.

It has, therefore, been the practice of the plaintiff at the end of the year to take into consideration the results obtained by its participating or mutual department during that year, and with the information at hand to determine the amount of the premiums necessary to be collected from participating policy holders during the succeeding year. In making this estimate the ascertained cost of the insurance for a given year has been taken broadly as the basis upon which to estimate the probable cost for the succeeding year, and upon this estimate the amount of the reduction to be made, or to be credited to policy holders on their stipulated premiums when paying the succeeding year's renewals, is determined. For the purpose of technical solvency, however, a small surplus is always maintained.

The premium reductions allowed by the plaintiff to the several policy holders are apportioned as near as can be upon an equitable basis with respect to their ages and plans of insurance. The policy holder, however, is permitted to pay the full stipulated premium, instead of the difference between the stipulated premium and the amount of the reduction, and in such case the overpayment beyond the amount actually required to continue the policy in force is applied, at the election of the policy holder, either to the purchase of additional insurance or pure endowment, or to shorten the endowment or premium-paying period of the policy. A comparatively small number of the policy holders avail themselves of this privilege, as also of a further option to allow the amount of excess payment to draw interest.

In the case of paid-up policies, the policy holder may annually receive in cash such amount as the company determines to be properly apportionable to him out of the savings of the current year; his share thereof representing principally the excess in interest earnings upon the invested policy reserve over the interest earnings which were assumed in fixing the stipulated premium. The plaintiff also pays in cash, in connection with the settlement of a small class of policies issued years ago upon a semi-tontine plan, dividends which represent accumulated savings upon this class of policies.

The right of the participating policy holder to reductions in annual premiums is evidenced in the outstanding policies of the company. The policies issued prior to July, 1903, contained merely the clause "with participation in the surplus," in distinction from the policies issued by the company containing the clause "without participation in the surplus." The applicant for insurance indicated his preference for a participating policy by answering a question contained in the application: "Kind of insurance applied for, ...... policy, on the mutual plan?" From July, 1903, to January, 1907, the participating policies issued contained the following provision:

"(9) Dividends are declared annually after the second year and may at the option of the insured be applied in any one of the following plans: First. In reduction of premium. Second. To purchase additional full-paid insurance. Third. To accelerate the time of maturity of the policy. Fourth. To purchase pure endowment payable in 10, 15, or 20 years."

The application during this period contained the words "stock" and "mutual," one of which was crossed out to indicate the applicant's election that the policy to be issued should be participating or nonparticipating.

From January, 1907, to June, 1910, the participating policies issued contained the following:

"Dividends. Reduction of premiums as determined by the company will be made annually beginning at the second year, or the insured may pay the full premium and instruct the company to apply the amount of reduction apportioned to him in any one of the following plans: 1. To purchase additional full-paid insurance. 2. To purchase pure endowment payable in 10, 15, or 20 years. 3. As a deposit with the company at 3½ per cent. compound interest, computed annually. 4. To accelerate the time of maturity of the policy. This policy, after full payment of all premiums as therein provided, will participate in an annual division of surplus earnings as apportioned by the company, such dividends to be applicable under any one of the above four options, otherwise payable in cash. The insured may by written notification to the company change the method of dividend application to take effect on any anniversary of the policy, and on any such anniversary may surrender for cash any accumulations under options 1, 2, or 3."

The application contained the following:

"Plan ................................................Participating or
                                                      Nonparticipating."

Also the question:

"If dividends are not desired in reduction of premiums, how shall they be applied?"

From June, 1910, the policies issued contain the following provision:

"Dividends. Reduction of premiums as determined by the company will be made annually beginning at the second year, or the insured may pay the full premium and instruct the company to apply the amount of reduction apportioned to him in any one of the following plans: 1. To purchase additional full-paid participating insurance which may be surrendered at any time for a cash value of the full reserve. 2. To purchase participating pure endowment which may be surrendered at any time for a cash value of the full reserve. 3. As a deposit with the company at not less than 3½ per cent. compound interest, computed annually. Such deposit may be withdrawn at any time. 4. To convert the policy into an endowment payable at a gradually decreasing age. 5. To shorten the premium-paying period. This policy, after full payment of all premiums as therein provided, will participate in an annual division of surplus earnings as apportioned by the company, such dividends to be applicable under any one of the first four options named above, otherwise payable in cash. The insured may by written notification to the company change the method of dividend application to take effect on any anniversary of the policy."

No change in the application was made at this time in respect of the participating feature.

These cover all of the provisions existing in the participating policy contracts of the plaintiff outstanding in the years 1909 and 1910.

According to the plaintiff's practice a notice is given to policy holders previous to the date premium is due. The material portion of the notice is as follows:

Please send or bring this notice with the cash payment.

Connecticut General Life Insurance Company,
Hartford, Conn.

Mr. ......................................
Dear Sir: The ...... annual premium on Policy No. ...... in this company will be due on the ...... day of ......, 191.., and payable as per statement below.

| | Make remittance payable to |
|---|---|
| Premium, — $...... | |
| Less Dividend $...... | ..........................................Agent, |
| | .......................................... |
| Cash Payment $...... | |

Upon payment of the premium required a premium receipt is given, in form as follows:

Renewal Receipt, Form 3.

| Premium $...... | Connecticut General Life Insurance Company, |
|---|---|
| Dividend Applied $...... | Hartford, Conn. |
| Amount Due $...... | Policy No. ...... |

Received, as per margin, $...../100, continuing in force the above numbered policy on the life of ...... for ...... months, from the ...... day of ......, 19...

Not valid, unless countersigned by ......, Agent.

George E. Bulkley, Secretary.

Countersigned at ......
this ...... day of ......, 19...
.........., Agent.

During the period of time covering the items in controversy complainant had about 37,000 policies, representing about $44,568,000 of insurance, outstanding, of which about $19,374,000 represented par-

218 F.—13

ticipating policies. About $164,000 of this was written on the "tontine" or "semi-tontine" plan. At the time of hearing this case the tontine policies outstanding numbered less than 100, and the amount of insurance represented thereby was about $35,000.

Section 3529 of the General Statutes of Connecticut (as amended by Pub. Acts 1903, c. 19, § 2) provides among other things that:

"Payments in the form of dividends, or otherwise, shall not be made to its stockholders by any life insurance company organized under the laws of this state, unless its assets exceed by the amount of such payment the amount of its paid-up capital stock and all of its liabilities, including its reinsurance reserve upon policies issued before January 1, 1901, computed upon the basis of the actuaries' or combined experience table of mortality with compound interest at four per centum per annum, and upon policies issued after said date computed upon the American experience table of mortality with compound interest at three and one-half per centum per annum; and no payment shall be made to the policy-holders of any such company except for matured claims and in the purchase of surrendered policies, unless the assets of such company exceed by the amount of such payments its liabilities, including its reinsurance reserve, computed as above provided in this section."

In section 3538 of said General Statutes (as amended by Pub. Acts 1907, c. 193, § 1) it is provided that:

"No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company or any agent, subagent, broker, or any other person, make any contract of insurance or agreement as to such contract, other than is plainly expressed in the policy issued thereon; nor shall any such company or agent, subagent, broker, or any other person, pay or allow, or offer to pay or allow, as inducement to insurance, any rebate of premium payable on the policy or any special favor or advantage in the dividends or other benefit to accrue thereon, or any valuable consideration or inducement whatever not specified in the policy of insurance."

Section 3527 of the General Statutes of Connecticut provides that:

"Every life insurance company chartered by this state shall, on or before the first of March in each year, render to the insurance commissioner a report, signed and sworn to by its president and secretary, of its condition upon the preceding thirty-first of December, which shall include a detailed statement of its assets and liabilities on that day; the amount and character of business transacted, moneys received and expended during the year; a descriptive list of all policies and contracts of insurance in force on that day; and such other information as the commissioner may deem necessary."

Under this last section of the statutes the plaintiff is required, as are all other life insurance companies doing business in Connecticut, to make an annual statement to the state insurance commissioner, upon blanks prepared and furnished by him, covering in detail its financial condition and business operations. In the statement of income and disbursements, as called for on said forms, the companies are required to report various facts which include duplications and cross-entries. Said form also requires a statement of "Ledger Assets," "Non-Ledger Assets," and "All Liabilities, Surplus, and Other Funds."

In its report upon this form to the state insurance commissioner for the years 1909 and 1910 plaintiff reported under 28 heads the following income items, viz.:

|  | 1909. | 1910. |
|---|---|---|
| 1. First year's premiums on original policies without deduction, less first year's reinsurance | $209,332 87 | $219,694 78 |
| 2. Surrender values applied to pay first year's premiums | 1,710 65 | 1,135 59 |
| 3. Dividends applied to purchase paid-up additions and pure endowments | 17,677 00 | 17,813 95 |
| 4. Surrender values applied to purchase paid-up insurance | 14,054 03 | 13,322 92 |
| 5. Consideration for original annuities involving life contingencies | 1,426 61 | 1,848 82 |
| 6. Total new premiums | $244,201 16 | $253,816 06 |
| 7. Renewal premiums, without deduction, less reinsurance | $1,150,933 75 | $1,260,812 93 |
| 8. Dividends applied to pay renewal premiums | 59,772 43 | 70,608 63 |
| 9. Dividends applied to shorten the endowment or premium paying period | 411 14 | 547 94 |
| 10. Surrender values applied to pay renewal premiums | 2,500 32 | 1,478 52 |
| 11. Total renewal premiums | $1,213,617 64 | $1,333,448 02 |
| 12. Total premium income | $1,457,818 80 | $1,587,264 08 |

Additional items in the income columns of said reports were:

|  | 1909. | 1910. |
|---|---|---|
| 13. Dividends left with the company to accumulate at interest | $4,353 99 | $5,188 35 |
| 14. Gross interest on mortgage loans | 207,678 56 | 249,157 64 |
| 15. Gross interest on bonds and dividends on stocks | 120,890 91 | 122,221 99 |
| 16. Gross interest on premium notes, policy loans, or liens | 50,990 35 | 62,148 79 |
| 17. Gross interest on deposits in trust companies and banks | 3,471 93 | 3,809 46 |
| 18. Gross interest on other debts due the company | 2,234 26 |  |
| 19. Gross interest on contract of sale |  | 171 33 |
| 20. Gross interest on capital stock |  | 18 |
| 21. Gross interest on premium |  | 2,129 04 |
| 22. Gross discount on claims paid in advance | 58 01 | 94 52 |
| 23. Gross rents from company's property, including $5,000.00 for company's occupancy of its own buildings | 22,711 60 | 22,201 04 |
| 24. Void premium notes restored | 63 50 |  |
| 25. Agents' balances previously charged off |  | 10 45 |
| 26. Gross profit on sale or maturity of ledger assets, viz.: |  |  |
| Real estate | 300 00 | 388 15 |
| Bonds | 810 79 | 2,675 00 |
| Stocks | 2,010 75 | 3,960 00 |
| 27. Unlisted assets, Arizona Water Company bonds | 645 00 |  |
| 28. Gross increase, by adjustment, in book value of ledger assets, viz.: |  |  |
| Bonds for accrual of discount | 1,532 00 | 1,666 00 |
|  | $1,875,570 45 | $2,063,086 02 |

The second, fourth, and tenth items of each of the income columns of the plaintiff's reports for these years represented no actual receipts

by the company, and were offset by corresponding cross-entries on the disbursement side of the account.

The amounts represented by the third item, "Dividends applied to purchase paid-up additions and pure endowments," and by the' thirteenth item, "Dividends left with the company to accumulate at interest," were also included in the seventh item, "Renewal premiums, without deduction," with the result that, although the company actually received these several amounts but once, they are twice accounted for in the footing of total income; the duplication being corrected by' cross-entries on the disbursement side of the account.

The eighth item, "Dividends applied to pay renewal premiums," entered both in the income and disbursement columns of the respective reports, represents as a matter of fact no pecuniary transaction, and merely shows the amount of reductions of which participating policy holders availed themselves when making payment of their renewal premiums during these years. In other words, it is the amount of the difference between the maximum premiums contained in their policy contracts and the amounts required of them and which they actually paid as renewal premiums, and the amounts represented thereby appear in the respective reports purely as a matter of bookkeeping.

Among other entries on the disbursement side of plaintiff's said respective reports the following items appear, viz.:

| | 1909. | 1910. |
|---|---|---|
| Gross decrease, by adjustment, in book value of ledger assets, viz.: Bonds for amortization of premiums.... | $ 6,201 79 | $ 6,655 29 |
| Gross loss on sale or maturity of ledger assets, viz.: | | |
| Real estate..................................... | 192 50 | 3,750 00 |
| Bonds ......................................... | 182 74 | 1,237 84 |
| Stocks ....................................... | | 690 67 |
| Dividends paid policy holders in cash................ | 17,990 56 | 32,254 53 |
| Dividends and interest thereon held on deposit surrendered during the year............................ | 537 78 | 1,086 89 |
| Paid stockholders for interest or dividends............ | 13,500 00 | 15,000 00 |

Also under the head of "Non-Ledger Assets" the following items, with others, are entered, viz.:

| | 1909. | 1910. |
|---|---|---|
| Interest on mortgages: | | |
| Due ........................................ | $ 2,178 67 | $ 2,678 40 |
| Accrued .................................... | 85,632 71 | 94,542 03 |
| Interest on bonds: | | |
| Due ........................................ | 400 00 | |
| Accrued .................................... | 37,686 22 | 40,374 01 |
| Interest on premium notes, policy loans, or liens: | | |
| Due ........................................ | 11,467 70 | 9,388 45 |
| Accrued .................................... | 8,592 68 | 8,364 84 |
| Market value of bonds and stocks over book value.... | 29,437 63 | 24,626 48 |
| Gross premiums due and unreported, on paid-for policies in force December 31: | | |
| New business.................................. | 4,304 46 | 4,649 21 |
| Renewals .................................... | 57,033 53 | 62,786 49 |
| Gross deferred premiums: | | |
| New business.................................. | 24,620 61 | 31,065 82 |
| Renewals .................................... | 181,079 19 | 191,706 26 |
| Net uncollected and deferred premiums: | | |
| New business.................................. | 23,568 24 | 29,005 42 |
| Renewals .................................... | 197,393 42 | 210,573 75 |

Under the head "Liabilities, Surplus, and Other Funds" there are several entries of items, and among them the following, viz.:

|                                | 1909.      | 1910.      |
| ------------------------------ | ---------- | ---------- |
| Premiums paid in advance       | $5,452 22  | $7,224 54  |

While in the reports made to the insurance commissioner of Connecticut for the years mentioned plaintiff stated its total income as $1,875,570.45 in 1909 and as $2,063,086.02 in 1910, nevertheless, when it came to make its return for the year 1909 to the United States Internal Revenue Commissioner in conformity to the act in question, plaintiff then stated that its total income was $1,779,180.35, and in its return for 1910 that it was $1,955,509.71. I find that the difference between the amounts appearing in the reports to the state insurance commissioner and the Internal Revenue Commissioner is practically accounted for by the method of reporting adopted by the insurance commissioner of Connecticut, which, as before stated, has resulted in duplication and cross-entries.

The Commissioner of Internal Revenue, however, as a first amendment to the plaintiff's 1909 return, added to the $1,779,180.35, returned by it as the gross income from all sources for the year 1909, the amounts covered by the following items:

(1) Dividends applied to pay renewal premiums....................$59,772 43
(2) Dividends applied to purchase paid-up additions and pure endowment ...........................................................17,677 00
(3) Dividends applied to shorten the endowment or premium paying period...........................................................411 14

The Commissioner deducted $1,532, representing the income item, "Bonds for accrual of discount," and disallowed $6,201.79, representing the item "Bonds for amortization of premiums," appearing on the disbursement side of plaintiff's report to the insurance commissioner of Connecticut for that year, which amount plaintiff had claimed as an item of deduction for depreciation when estimating its net income in the return which it made to the Commissioner of Internal Revenue, and thereby he increased the amount of net income to the extent of the difference between these two items, viz., $4,669.79. He further increased the amount of net income by disallowing $1,105 of the sum which plaintiff had claimed for deduction on account of its reserve for that year.

Subsequently the Commissioner made a second amendment to plaintiff's gross income for that year by adding thereto an assumed premium income of $22,536.41, which represents the difference between the amount of "gross premiums due and deferred" on December 31, 1909, appearing in plaintiff's report to the insurance commissioner of Connecticut, and the amount of similar items set forth in plaintiff's report to the insurance commissioner of Connecticut for the year ending December 31, 1908, less $5,452.22, the amount of the item "Premiums paid in advance" during the year 1909.

The Commissioner also, by his second amendment, added to the gross income the sum of $9,168.01, which sum represents the difference between the amount of interest reported as "due and accrued" on December 31, 1909, and the amount stated by plaintiff in its report to

The state insurance department as being due and accrued on December 31, 1908. He further added two items which plaintiff does not now dispute, viz.: "Gross discount on claims paid in advance, $58.01;" "Void premium notes restored, $63.50"—and then added $1,532, the amount of the item "Bonds for accrual of discount," which he had previously deducted from the amount of gross income stated in plaintiff's original return, and $14,054.03, representing the item "Surrender values applied to purchase paid-up insurance"; but he offset this last item by allowing the amount thereof as a deduction item in computing plaintiff's net income. He also allowed as a deduction the item "Bonds for amortization of premiums, $6,201.79," which he had previously disallowed, and the result was that the gross income return for 1909, as amended, was increased from $1,779,180.35 to $1,902,920.88.

The plaintiff's return of gross income for the year 1910 was $1,955,509.71, and to this amount the Commissioner added the following items:

(1) Dividends applied to pay renewal premiums...................$70,608 63
(2) Dividends applied to purchase paid-up additions and pure endowments .............................................. 17,813 95
(3) Dividends applied to shorten the endowment or premium paying period........................................... 547 94

The Commissioner, however, in said amendment deducted from plaintiff's income return $1,666, the amount represented by the income item "Bonds (for accrual of discount)," which plaintiff had included as part of its gross income for 1910; but, on the other hand, he disallowed the disbursement item, "Bonds (for amortization of premiums), $6,655.29," which plaintiff had claimed as a deduction allowance for depreciation when computing its net income, with the result that plaintiff's net income was thereby increased to the extent of the difference between those two items, viz., $4,989.29.

By his second amendment to the 1910 return the Commissioner added to the gross income a premium item of $21,397.67, which represents the difference between the "uncollected and deferred premiums" reported by plaintiff to the Connecticut insurance commissioner as of December 31, 1910, and the amount of like items stated in its previous report as of December 31, 1909. He also added, for interest, $6,599.71, which amount is the difference between the total amount of "Interest due and accrued" reported by plaintiff as of December 31, 1910, and that so reported as of December 31, 1909 (less $32,669.19, the amount of the item "Premiums paid in advance" during that year), and also $94.52, being the amount of the item "Gross discount on claims paid in advance"; but by disallowing the item "Increase in net addition to reserve, $441.54," which plaintiff had claimed as a disbursement and deduction item in computing its net income, he thereby made further addition to plaintiff's net income of the amount of the difference between these two items, viz., $347.02.

He likewise added to the amount of gross income $13,322.92, representing the item "surrender values applied to purchase paid-up insurance"; but the effect of the addition of this last item was offset by the allowance of a like sum as a deduction item in the estimating of plaintiff's net income for that year. He, however, added the sum of $1,-

666, representing the income item, "Bonds (for accrual of discount)," which he had previously deducted from the amount of plaintiff's return of gross income, and then allowed as-a deduction item $6,655.29, "Bonds (for amortization of premiums)," which he had previously disallowed. In this way plaintiff's original gross income return for 1910 was amended and increased from $1,955,509.71 to $2,085,895.05.

For the purpose of making clear the matters in dispute between them, counsel for the parties entered into the following stipulation:

United States District Court, District of Connecticut.

The Connecticut General Life Insurance Company v. Robert O. Eaton,
Collector.

At Law—No. 1907.

Stipulation.

In the above entitled cause it is stipulated and agreed that the following is a correct statement of the amounts of the several items as to which the parties are at issue and of the several amounts which the complainant would be entitled to recover, if its respective claims be sustained:

In connection with complainant's income for year 1909:

Commissioner's First Amendment of Return.

Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut, as contained in Connecticut Insurance Report of 1910 (Government's Exhibit I), page 65, as "Dividends applied to pay renewal premiums"..............$59,772 43

Amount added to gross income on account of items described in complainant's financial statement made to the insurance commissioner of Connecticut as contained in Connecticut Insurance Report of 1910 (Government's Exhibit I), page 65, as "Dividends applied to purchase paid up additions and pure endowment," $17.677, and "Dividends applied to shorten the endowment or premium paying period," $411.14............ 18,088 14

Net amount of correction by Commissioner due to exclusion from gross income of item "Accrual of discount," $1,532, and to exclusion from amount of depreciation of item "Amortization of bond values," $6,201.79........................... 4,669 79

Commissioner's Second Amendment of Return.

Net amount added to gross income as result of computing net income on so-called revenue basis, to wit: Premiums, $22,536.41; Interest, $9,168.01............................... 31,704 42

Net amount of increase of net income by items whose correctness is not disputed: Discount on claims paid in advance, $58.01; notes restored, $63.50; deduction from reserve, $1,105. ................................................. 1,226 51

Net amount of items—"Accrual of discount," $1,532; and "Amortization of bond values," $6,201.79—excluded in previous amendment and reinstated by Commissioner........... 4,669 79

On account of the first three items above the complainant paid an additional tax on June 29, 1911, of $825.30, and, if complainant's respective claims as to said items are sustained, complainant would be entitled to recover on account of said items, respectively, $597.72, $180.88, and $46.70, with interest thereon from said June 29, 1911 (except that the item of $46.70 is not recoverable in the event that it be held that the Commissioner in his second amendment correctly included the so-called revenue basis items).

The complainant paid on February 3, 1912, on account of the corrections in the second amendment, $282.61, of which the assessment and collection of $12.27 is not disputed. If the inclusion of the revenue basis items was in accordance with law, there should be no recovery on account of this second payment; but otherwise the complainant would be entitled to recover, by

reason of its payment under the second amendment, $270.34, with interest from said February 3, 1912.

In connection with complainant's income for year 1910:

### Commissioner's First Amendment of Return.

| | |
|---|---|
| Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut, as contained in Connecticut Insurance Report of 1911 (Government's Exhibit II), page 61, as "Dividends applied to pay renewal premiums"............... | $70,608 63 |
| Amount added to gross income on account of items described in complainant's financial statement made to the insurance commissioner of Connecticut, as contained in Connecticut Insurance Report of 1911 (Government's Exhibit II), page 61, as "Dividends applied to purchase paid up additions and pure endowments," $17,813.95, and "Dividends applied to shorten the endowment or premium paying period," $547.94........ | 18,361 89 |
| Net amount of correction by Commissioner due to exclusion from gross income of item "Accrual of discount," $1,666.00, and to exclusion from amount of depreciation of item "Amortization of bond values," $6,655.29.................. | 4,989 29 |

### Commissioner's Second Amendment of Return.

| | |
|---|---|
| Net amount added as result of computing net income on so-called revenue basis: Premium, $21,397.67; Interest, $6,599.71 ............................................... | 27,997 38 |
| Net amount of correction by Commissioner due to inclusion in gross income of item "Discount" $94.52, and increase in "Net addition........ to reserve," $441.54........................ | 347 02 |
| Net amount of items "Accrual of discount," $1,666, and "Amortization of bond values," $6,655.29, excluded in previous amendment and reinstated by Commissioner................ | 4,989 29 |

On account of the first three items above the complainant paid an additional tax on June 29, 1911, of $939.60, and, if complainant's respective claims as to said items are sustained, complainant would be entitled to recover on account of said items, respectively, $706.09, $183.62, and $49.89, with interest thereon from said June 29, 1911 (except that the item of $49.89 is not recoverable in the event that it be held that the Commissioner in his second amendment correctly included the so-called revenue basis items).

The complainant paid on February 3, 1912, on account of the corrections in the second amendment, $226.61. If the inclusion of the revenue basis was in accordance with law, there should be no recovery on account of this second payment; but otherwise the complainant would be entitled to recover, by reason of its payment under the second amendment, $226.61, with interest from said February 3, 1912.

Complainants,

By Robinson, Robinson & Cole, Its Attorneys.

Frederick A. Scott, U. S. Attorney.

Francis H. Parker, Assistant Attorney.

This case resembles in its main features the case of Mutual Benefit Life Insurance Co. v. Herold, decided by the United States District Court of New Jersey, Cross, J., reported in 198 Fed. 199–218, and confirmed by the Circuit Court of Appeals for the Third Circuit, 201 Fed. 918. That case, however, concerned a purely mutual company without capital stock, whereas this case concerns a company with a paid-up capital stock of $300,000, although, on the other hand, it appears that the plaintiff, while a stock company, conducts and for a long time has conducted its mutual department solely for the benefit of the holders of its participating policies, and that they have had all the advantages of a purely mutual company, with just so much additional

protection and security as is represented by the paid-up capital of the company. So that it would seem as though the same principles of law are applicable to both cases.

Whatever return stockholders receive from their investments in the stock of the plaintiff company comes, and of necessity, therefore, must come, from the company's nonparticipating department; but, judging from the reports which the plaintiff has submitted to the insurance commissioner of Connecticut, the owners of the plaintiff's stock have had thus far no reasonable cause of complaint as to results affecting their investments.

The essential parts of section 38 of the said act of Congress approved August 5, 1909, are as follows:

"That every * * * insurance company, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such * * * insurance company, equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, * * * subject to the tax hereby imposed. * * *

"Such net income shall be ascertained by deducting from the gross amount of the income of such * * * insurance company, received within the year from all sources, (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, * * * (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any, and in the case of insurance companies the sums other than dividends, paid within the year on policy and annuity contracts and the net addition, if any, required by law to be made within the year to the reserve funds."

[1] The controversy herein has been waged mainly over the question as to whether said section was intended to apply to the so-called "dividends" of a life insurance company operating on the mutual plan, or one conducting a mutual insurance department under conditions such as have obtained in the participating department of the plaintiff company; and before deciding the question thus presented it becomes necessary to consider the different claims of the parties pertaining to this feature of the case.

Briefly stated, the plaintiff claims that the so-called "dividends" in this controversy represent nothing more than a simple reduction allowed to its participating policy holders when paying their renewal premiums, and that consequently the amounts represented by these items are not "dividends" as that term is usually understood, and, further, that Congress must have passed the act with a full knowledge of this fact, therefore the act was not intended to apply to the so-called "dividend" items which form the subject of this controversy.

On the other hand, the gist of the defendant's claim is that the amounts of the disputed items termed "dividends" represent portions of plaintiff's profits or surplus no longer needed to provide for the cost of insurance, expense of management, or as a guaranty fund against future losses, which equitably belong to the mutual policy holders of the company, in proportion to their contribution to the company's funds; that when the plaintiff decides as to the amount of reduction to be allowed to its participating policy holders on their renewal pre-

mium payments, it in fact declares a dividend in their favor for their equitable proportion of said profits or surplus, and that such portion thereby vests in the policy holder, to be divested only in accordance with the provisions of his policy contract; that when the mutual policy holder avails himself of the reduction allowed in making payment of his renewal premium, or pays the full amount of his stipulated premium, and has the amount of such reduction applied by the company either to the purchase of additional insurance, the shortening of the premium-paying period of his policy, or the acceleration of the payment of his endowment, as the case may be, the allowance availed of, or if applied in either of the manners stated, is a payment to the company of the amount of his dividend (or allotment of profits or surplus), and that the payment so received is in each case "income received within the year" by the plaintiff company, within the provisions of section 38 of said act.

The defendant, to sustain his contention, quotes from the case of Fuller et ux. v. Metropolitan Life Insurance Co. of New York, 70 Conn. on pages 664, 665, and 666, 41 Atl. 11, wherein the Supreme Court of Connecticut has said:

"This sum, * * * called profits, * * * is in fact a surplus resulting from overpayments by policy holders. This surplus is derived from money paid by the insured and received by the company for a particular purpose; i. e., providing for cost of insurance and expense of management. If not needed for that purpose, it should in equity be returned to the policy holders. They do not, however, own it, or have any legal control over its distribution; part of it, indeed, is derived from contributions of policy holders who are dead; but the equity is recognized, and it is the duty of the company, when a surplus is ascertained, to return such portion as it does not deem proper to keep as a guaranty fund to the existing policy holders in equitable (i. e., as nearly as practicable) proportion to their overpayments or contributions. Such return of overpayments, whether in cash, or by application on future premiums, or by increase of the amount insured, is a dividend. This is the meaning of 'dividend,' and the only meaning it has or can have in connection with mutual insurance." And "when a policy lapses the portions of prior premiums invested and held in reserve can no longer be applied to the purpose for which they were made, and, to the extent of the net gain by the lapse, become overpayments, and in equity should be returned to the holder of the lapsed policy, or to the surplus for the benefit of all. A dividend, therefore, is a distribution of existing overpayments resulting mainly from savings on the annual cost of insurance and expense of management, and in part from savings on the future cost of insurance, i. e., the net gain from lapsed policies."

But it should be remembered that the Fuller Case concerned the construction to be given to certain insurance contracts issued on the so-called "tontine plan," and that the dispute therein mainly arose as to the rights of certain ones of a class of policy holders to obtain a portion of a fund which had been accumulated over a period of ten or more years under what was termed the "reserve dividend plan," in accordance with which those insured in the different classes were to be entitled to receive their proportionate part of the amount thus accumulated only in the event of their surviving for such period as was named in their policy contracts; while the evidence in this case is that the items termed "dividends," on which defendant has collected an additional tax (because they were added by the Commissioner of

Internal Revenue to the gross income of the return which plaintiff made to him), do not represent an accumulated fund, but represent merely the total amount of reductions (or rebates) allowed to certain classes of policy holders of plaintiff's mutual department in accordance with a plan put into operation by the company's executive officers, whereby annually a sum decided upon has been allowed as a reduction or rebate to be availed of by each policy holder of the class when making payment of the renewal premium required by his contract of insurance, and the benefit of which reduction he can elect to receive in either of the ways permitted him by his contract.

It also should be borne in mind that, during the time covered by the matters sought to be litigated herein, the plaintiff has outstanding from $100,000 to $164,000 of insurance written on the "reserve dividend plan," and that to this class of policy holders, as well as to a much larger class, such as the holders of "paid-up policy contracts," etc., plaintiff did in fact pay large sums in cash as dividends ($17,990.56 in 1909, and $32,254.53 in 1910), and that for the cash dividends thus paid plaintiff has made no claim for reduction in its said reports to the Commissioner of Internal Revenue. Neither has plaintiff made claim of a right to a deduction of the amounts of the disbursement items "Dividends and interest thereon held on deposit surrendered during the year," $537.78 in 1909 and $1,086.89 in 1910.

It would appear, therefore, that under the conditions disclosed by the evidence as to the method of operation adopted and pursued by plaintiff in conducting the mutual or participating department of its business the items reported as "Dividends applied to pay renewal premiums," "Dividends applied to purchase paid-up additions and pure endowment," and "Dividends applied to shorten the endowment or premium-paying period," represent nothing more than the amount of the excess of the loading of the policy holders' premiums, over and above the cost to the company of such policy holders' insurance, and that the application made by the said policy holders in either of the ways stated is not such a payment of dividends as contemplated in section 38 of the said act of August 5, 1909.

In arriving at this conclusion the claim made by defendant's counsel as to the rule which should govern in the construction to be given the matter has not been overlooked, but has been applied, in that the court has endeavored to ascertain fairly the meaning and will of Congress as expressed in the particular enactment, to the end that the enforcement of the same might be upheld.

In coming to its conclusion the court adopts to a certain extent the reasoning of the learned judge in the case of Mutual Benefit Life Insurance Co. v. Herold, supra. Still, from another point of view which might be had of the question under consideration, one is strongly inclined to believe that the Sixtieth Congress, when passing said act, must have been of the opinion that the term "dividends," when applied to mutual life insurance companies under conditions such as obtain here, would without question be construed as a previous Congress had said it should be construed. In Act June 30, 1864, c. 173, § 120, 13 Stat. 223, 283, and the amendment thereto (Act July 13, 1866, c. 184, 14 Stat. 98, 138), it was provided:

"That the tax upon the dividends of life insurance companies shall not be deemed due until such dividends are payable; nor shall the proportion of premiums returned by mutual life insurance companies to their policy holders, nor the annual or semiannual interest allowed or paid to the depositors in savings banks or savings institutions, be considered as dividends."

It will be noticed that Congress, in the law of 1864, differentiated between "dividends payable by life insurance companies" and so-called "dividends" representing portions of premiums returned to their policy holders.

It therefore seems fair to assume that, Congress having once declared that a distinction should be drawn between these two kinds of dividends in an act of legislation intended to accomplish practically the same purpose as the act now in question, the members of a later Congress, when considering the enactment of the new legislation, were of the opinion that the distinction so clearly stated in the previous enactment would still be held to apply in the interpreting of the same term appearing in the new enactment, until such time as Congress would see fit, by positive action, to disclose a change of intention in relation to that subject.

"The true meaning of a statute is discovered, not merely from its words, but also by comparison with other parts of the act, by reference to previous legislation upon the same subject, and by ascertaining the cause and occasion of the passage of the act, and the purpose intended to be accomplished thereby." City of Middletown v. N. Y., N. H. & H. R. R. Co., 62 Conn. 492, 496, 27 Atl. 119, 120.

Upon the above point the following quotations from the opinion of Judge Cross in the case of Mutual Benefit Life Insurance Co. v. Herold (D. C.) 198 Fed. 199, seem quite appropriate. On pages 211 and 212 he says:

"In seeking to ascertain the intention of Congress, it seems but reasonable to assume, in the absence of anything to the contrary, that it used the word 'dividends,' as applied to insurance companies, in the sense it had long and generally borne in insurance matters, which sense had, moreover, been confirmed by repeated judicial decisions. The term should, in other words, be given what might not inappropriately be called its trade signification. Hedden v. Richard, 149 U. S. 346, 13 Sup. Ct. 991, 37 L. Ed. 763. Hence, when it refers to dividends 'paid,' it means dividends paid, and not an application of excess premium payments in abatement or reduction of subsequent premiums. The word 'paid,' as used by Congress, is highly significant. It clearly shows that it had cash payments in mind. * * *

"If, therefore, a policy holder by the express provision of his policy elects to have a previous overpayment of premium applied in reduction of a succeeding stipulated premium, what he pays, and all that he pays, or can be required to pay, is the reduced premium, and that is all that the company receives by way of income, and all that it is liable to be taxed for. Such a construction of the act in no wise contravenes its purpose, which was to subject to taxation cash dividends, which, as statistics show, form a very large item in insurance business. Since, then, there is subject-matter which the clause of the act plainly embraces, there is neither reason nor propriety in broadening its scope of construction, so as to make it include that which, by strong implication, at least, it excludes. * * *

"Dividends of the kind under consideration should not be confused with dividends declared in the case of a full-paid participating policy, wherein the policy holder has no further premium payments to make. Such payments having been duly met, the policy has become at once a contract of insurance and of investment. The holder participates in the profits and in-

come of the invested funds of the company. His case is, therefore, radically different from that of a policy holder whose dividend represents merely the excess cost of his insurance, which excess at his request, and pursuant to the terms of his policy, has been applied in abatement or reduction of a future premium. But it may be urged that the fund for which the so-called dividends are declared on mutual policies is likewise largely derived from interest on the company's investments, and that this shows that in a real sense such dividends are, after all, declared from the earnings, profits, or income of the company. This proposition might be entitled to weight, were it not for the fact that, in so far as the fund from which such dividends are declared is produced from interest on the company's invested funds, it has already been subjected to, and has paid, taxes under the act in question."

The amounts of the items "Bonds for amortization of premiums," which plaintiff listed in the disbursement columns of its said reports, should have been allowed as a disbursement, because the testimony shows that the method of annually scaling down the book values of bonds purchased at a premium, and making additions to the book value of bonds purchased below par (represented by the items "Bonds for accrual of discount," found in the income columns of plaintiff's said returns), is in accordance with the law and the requirements of the insurance departments of the different states. Under these circumstances it would seem as though the Commissioner, by adding the net amount of the difference between these two items, committed an error, and that therefore the tax paid by the plaintiff on the amount of this net difference should be recovered; but it is fair to add that in the second amendment for both years the Commissioner conceded the propriety of the deduction of items "Bonds for amortization of premiums" in connection with the inclusion in income of "Bonds for accrual of discount."

[2] As to the net amount of the items "Uncollected and deferred premiums" and "Interest due and accrued," which the Commissioner has added to the amounts of the gross income returned by plaintiff, it was shown by testimony in the case that these items were listed in the reports which the plaintiff made to the state insurance commissioner of Connecticut as "Non-Ledger Assets," because required by the forms furnished plaintiff upon which to make such reports; but that, notwithstanding the fact that these items were so entered, the items themselves did not represent any income for the year in which they were reported, and that they could not be considered as "ledger assets," because there is always a question as to how much thereof will ever be received, due to the peculiar status of insurance policy contracts, in so far as compelling policy holders to pay any portion of the stipulated premiums mentioned therein in the event of the policy holder refusing to make payment. It was further testified that plaintiff duly entered as income and made return for such portion of these items as it received during the years wherein they were paid.

[3] Income may be defined as the gain derived from capital, from labor, or from both combined (Stratton's Independence v. Howbert, 231 U. S. 399, 34 Sup. Ct. 136, 58 L. Ed. 285); and as no appreciable gain or benefit could accrue to the plaintiff on account of these items until the same were paid or realized on, this fact, taken in conjunction with the fact that, when payments thereon were made to plaintiff,

such payments were duly accounted for and included in plaintiff's returns of gross income for the year they were received, the Commissioner of Internal Revenue was in error in adding any portion of the amount of these items to the returns for the years under consideration, and therefore the amount of the tax which was exacted from plaintiff because of such addition should be returned.

In view of the agreement contained in the stipulation of counsel relating to the amount of increase to the net income, by the addition of items aggregating $1,226.51 in the Commissioner's "Second Amendment of Return" for the year 1909, the amount of tax collected upon these items is to be retained by defendant.

The issues having been found in favor of the plaintiff upon the items "Dividends applied to pay renewal premiums," "Dividends applied to purchase paid-up additions and pure endowments," "Dividends applied to shorten the endowment or premium paying period," "Bonds for amortization of premiums," "Premiums due and deferred," and "Interest due and accrued, but not collected," judgment will be entered, pursuant to the terms contained in the stipulation of counsel, in favor of the plaintiff, as follows:

First. To recover from the defendant the sum of $825.30, with interest from June 29, 1911;

Second. To recover the sum of $270.34, with interest from February 3, 1912;

Third. To recover the sum of $939.60, with interest from June 29, 1911; and

Fourth. To recover the sum of $226.61, with interest from February 3, 1912.

Decree accordingly.