CONNECTICUT MUT. LIFE INS. CO. v. EATON, Internal Revenue Collector.

(District Court, D. Connecticut. October 27, 1914.)

No. 1710.

1. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—MUTUAL LIFE INSURANCE COMPANY—"DIVIDEND"—"INCOME RECEIVED."

In the case of a mutual life insurance company doing business on the level premium plan, which at the end of a year, when the actual cost of carrying a policy is ascertainable, credits the policy holder with the surplus premiums paid, which may be applied in payment of renewal premiums or in other ways provided, such surplus does not represent "income received" by the company during the year, nor "dividends" paid to policy holders, and is not taxable under Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300, 6301).

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, First and Second Series, Dividend.]

2. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—DEDUCTIONS FROM GROSS INCOME—EXPENSES OF BUSINESS.

Amounts expended by a business corporation in enlarging or making improvements in its office or premises, not in the nature of permanent

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

improvements to the property, but to facilitate the transaction of a growing business, should properly be deducted as necessary expenses of the business in computing the taxable net income of the corporation, under Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300, 6301).

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

3. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—"NET INCOME."

The "net income" of a corporation for any year, taxable under Corporation Tax Act of Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300, 6301), is limited to such income, less allowable deductions, as was actually received during that year, and does not include items which may have been earned, or have become due, but have not been collected.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, First and Second Series, Net Income.]

4. INTERNAL REVENUE (§ 9*)—EXCISE TAX ON CORPORATIONS—PROFITS AND LOSSES ON REAL ESTATE.

A mutual life insurance company from time to time acquired real estate through foreclosure of mortgages securing loans made thereon, which property was carried on the books at a valuation equal to its original cost to the company, and was listed as assets at such valuation in reports to the various state commissioners. In its reports to the Commissioner of Internal Revenue under Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300, 6301), the company listed as profits or losses, as the case might be, the difference between the book value and the selling price of such of the real estate as it had sold during the year. Held that, under the provision of the act for the deduction from gross income of "all losses actually sustained within the year and not compensated by insurance or otherwise," in the absence of evidence to the contrary, the profits and losses on such sales should be treated as having been made or sustained during the year, and the company was chargeable in its gross income with the profits made, and entitled to a deduction of the full amount of the losses.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. § 9.*]

At Law. Action by the Connecticut Mutual Life Insurance Company against Robert O. Eaton, as Collector of Internal Revenue for the District of Connecticut. Trial to court. Judgment for plaintiff.

Lucius F. Robinson, of Hartford, Conn., for plaintiff.

Francis H. Parker and Frederick A. Scott, U. S. Dist. Atty., both of Hartford, Conn., for defendant.

THOMAS, District Judge. This case, like that of Connecticut General Life Insurance Co. v. Eaton, Collector (D. C.) 218 Fed. 188, was brought to recover taxes paid under protest to defendant as Collector of Internal Revenue for the district of Connecticut, which plaintiff claims were illegally assessed against it under and by virtue of the act of Congress approved August 5, 1909 (36 Stat. 112, c. 6, § 38 [Comp. St. 1913, §§ 6300, 6301]), entitled "An act to provide revenue, equalize duties and encourage the industries of the United States, and for other purposes." The essential provisions of the act, for the purpose of considering this case, are:

"That every * * * insurance company * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such * * * insurance company, equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations * * * subject to the tax hereby imposed. * * *

"Such net income shall be ascertained by deducting from the gross amount of the income of such * * * insurance company, received within the year from all sources, (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, * * * (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any, and in the case of insurance companies the sums other than dividends, paid within the year on policy and annuity contracts and the net addition, if any, required by law to be made within the year to the reserve funds. * * *"

The parties having waived a jury, the case has been heard and determined by the court in accordance with the stipulation entered into by counsel. A finding of facts, in the nature of a special verdict, has been made by the court and filed with the clerk.

The plaintiff's claim is that the Commissioner of Internal Revenue erred in making certain additions to its respective returns of gross income for the years 1909 and 1910, as well as in disallowing the amount of certain items in said returns which plaintiff says were allowable as deductions under the act to which reference has been made. It will therefore be seen that the court is called upon to decide questions very similar to those presented in the case of Connecticut General Life Insurance Co. v. Eaton, Collector, although some of the items herein are somewhat different from some considered in that case.

The plaintiff is a mutual life insurance company, without capital stock, incorporated and operating under a charter issued by the General Assembly of Connecticut in 1846 (Private Laws of Connecticut, vol. 3, pp. 646, 647), and is managed by a board of directors chosen by vote of its members, the policy holders; the board of directors in turn choosing the executive officers of the corporation. Plaintiff conducts its business upon the so-called "level premium plan," for an explanation of which see Connecticut General Life Insurance Co. v. Eaton, Collector (D. C.) 218 Fed. 188.

Section 14 of the company's original charter provides that:

"On the first Wednesday of January after the organization of said company, or within one month thereof, and in like manner and at like time in each succeeding year, the said company shall cause an estimate to be made of the profits and true state of their affairs for the preceding year; * * * and shall thereupon cause a balance to be struck of the affairs of said company, in which they shall charge each member with a proportionate share of the losses and expenses, according to the original amount of premiums paid by him or her (but in no case shall such share exceed the amount of such premium); and such member shall be credited with his or her proportionate share of the amount of the premiums earned, after deducting the losses and expenses, and of the profits of said company derived from investments, which share of profits so derived shall be credited to each member for his or her proportionate share of the premiums earned, and he or she shall be entitled to a certificate on the books of the company, such certificate to contain a proviso that the amount named therein is liable at any future time for any future losses of the said company."

In the second section of an amendment to the charter obtained in 1856 (3 Priv. Laws, p. 649) it is provided:

"That section fourteenth of said charter be further amended as that dividends or earned premiums may be credited to the members of the company, at the discretion of the directors, and that such dividend credits or certificates may be made due and payable at such times and in such manner as the directors, by their votes, shall determine; and nothing in said section shall require a dividend to be credited to a member, until he or she shall have been insured for the period of one year, and have paid two premiums to said company."

Section 16 of the company's original charter provides that:

"Whenever the net profits of said company shall exceed in amount the sum of two hundred thousand dollars, the excess may be applied from year to year towards the redemption of each year's certificates in the order of their dates and according to their respective priorities."

Section 17 provides:

"That in case any person entitled to a certificate of profits shall be indebted to said company, they may withhold the certificate and deduct such indebtedness therefrom or cancel the same, according to the amount of said indebtedness. * * *"

Section 18 provides:

"If a loss accrues under any policy, the certificates of profits issued under the same shall become payable at the same time with such policy; if such policy expires by lapse of time without loss, then the certificates issued under the same shall remain outstanding and liable to assessments, and entitled to payment, according to the provisions of this resolution."

With the view of conforming to the language of section 14 of the charter as amended, the directors of the company each year have met and passed votes substantially the same as the following, which was passed on January 8, 1909:

"Voted: That the estimate made of the profits and true state of affairs of this company for the year 1908, this day submitted by the actuary for the consideration of this board, be, and the same is, accepted and adopted as the estimate required by section 14 of the charter of this company.

"Voted: That in accordance with said section 14 of the charter of this company and the amendments thereto, and the contracts of this company, from the earned premiums and profits as ascertained by said estimate, dividends be credited to the members of this company, and to the payees under participating installment contracts, payable at the time and on the conditions following:

"To members insured by participating policies on the payment, or nonpayment when due, of the third or any subsequent annual premium due in 1909, or the first installment thereof; but if only certain installments of the third or any subsequent annual premium due in 1908 were or shall be paid on participating policies, and nothing on account of premiums thereafter, only the corresponding fraction of such dividend shall be credited on the next anniversary of the due date of the annual premium if the policy be then in force; or, upon the absolute termination in 1909 of any participating premium-paying policy upon which certain installments, or the whole, of the third or any subsequent annual premium due in 1908 or 1909 were or shall be paid, the then present worth of such fraction, or of the whole, of such dividend discounted back from the next anniversary at the rate of 5 per cent. per annum shall be payable; and on payment of the whole or a semiannual or

quarterly installment of the second annual premium the whole, one-half, or one-fourth of the annual dividend shall be allowed.

"To members insured by participating single premium or paid-up¹ policies or additions, upon the anniversary in 1909 of the date thereof, or, in case of continuing automatic insurance, of the due date of the annual premium named in the policy if then in force, except that in case of automatic paid-up insurance which became, or shall become, paid up after the anniversary in 1908 and prior to the anniversary in 1909 only a proportional part of such dividend shall be credited.

"To payees under participating installment contracts, on payment in 1909 of an annual installment certain other than the first or the first fractional payment thereon.

"To persons legally entitled thereto, upon such participating policies as may be received as claims by death or maturity during the year 1909, upon payment of such claims.

"The amount of each such dividend to be ascertained in accordance with the suggestions and recommendations submitted by the actuary this day with the said estimate, which suggestions and recommendations are hereby adopted, and ordered to be spread upon this record, and referred to as a part of this vote.

"This vote is to be construed as of January 1, 1909, and as applying only to policies then in force, or which may be reinstated in 1909."

Whatever references the forms of policies issued by plaintiff have contained as to the right of policy holders to participate in profits or surplus have been varied, as will be seen from the following:

Policies issued from July 1, 1870, to October 31, 1872, provide:

"That, in case of default in the payment of any annual premium when due hereon, if there shall then be a sum sufficient to meet said premium credited by this company upon this policy, by way of dividends or surplus premiums, then, if there be no other indebtedness to this company on account of this policy, said premium shall be considered and receipted as paid, by the cancellation of an equal amount of such dividends or surplus premiums, and that all such dividends or surplus premiums remaining in the custody of this company at the maturity of this policy shall then be payable with the sum herein insured."

On the back of the policy forms in use from December 31, 1887, to April 23, 1904 (with the possible exception of an occasional form used in the latter part of that period), there was this notice:

"The insured under this policy is a member of the company. Members share in its surplus as provided in its charter."

Policies issued between July 1, 1896, and April 23, 1904, contained this additional clause:

"That in case of default in the payment of any premium or installment of premium when due hereon, if a sum sufficient to fully meet said payment, or a quarterly installment of the annual premium, shall have been previously credited by this company on account of this policy by way of dividends or surplus premiums, then if there be no other indebtedness to this company on account of this policy, said premium or installment of premium shall be considered and receipted as paid by the application and cancellation of an equal amount of such previous credit; but such dividends or surplus premiums shall not be so applied unless sufficient to pay in full the required payment or the quarterly cash installment of the annual premium; and any balance of such dividends or surplus premiums declared and credited, remaining in the custody of this company at the maturity of this policy, shall then be payable with the sum herein insured."

Those issued from April 25, 1904, to August 31, 1906, provide that:

"This policy will participate in the distribution of surplus as provided in the charter of the company."

"That in case of default in the payment of any premium or of any installment of premium when due hereon, if a sum at least equal to such payment or to a quarterly cash installment of the annual premium shall have been previously credited by the company on account of this policy by way of dividends or surplus premiums, then if there be no other indebtedness to the company on account of this policy, and unless otherwise directed by the insured, said premium or installment of premium shall be paid by the application and cancellation of an equal amount of such previous credit; but such credit shall not be so applied unless sufficient to pay in full the required payment or at least a quarterly cash installment of the annual premium, and any balance of such credit remaining in the custody of the company at the maturity of this policy shall be payable with the sum herein insured."

Those issued from September 1, 1906, to December 31, 1907, provide that:

"This policy, upon payment of the second annual premium and during its continuance thereafter either as a premium-paying or a paid-up policy, will participate in annual dividends as declared and respectively apportioned by the company's directors. Dividends declared and credited may be applied on premiums due hereon, or drawn in cash, or left with the company to accumulate at such rate of interest as the directors may determine. Any dividends due on account of this policy at its maturity shall be payable with the sum herein insured."

"If any premium or installment of premium be not paid as herein provided, and if there be at that time accumulated dividends credited on account of this policy at least equal to the cash payment required, then, unless previously directed to the contrary in writing by the payee of such accumulations, said payment shall be made by the application and cancellation of an equal amount of such credit; and if such credit be less than the required payment, then out of such credit, if sufficient, shall be paid a semi-annual or quarterly cash installment of the annual premium."

Those issued from January 2, 1908, to February 19, 1913, provide that:

"This policy, upon payment of the second annual premium and during its continuance thereafter either as a premium-paying or a paid-up policy, will participate annually in the divisible surplus which shall be determined and apportioned by the company. The dividend (1) shall be payable in cash to the insured or his assigns, or (2) at the option of the payee thereof, if the company be directed in writing by said payee prior to the expiration of thirty-one days after such dividend becomes payable, may be * * * (2) left with the company, subject to withdrawal, to accumulate at such rate of interest, credited annually at not less than three per centum, as the company may determine, or (3) applied on a premium due hereon, or (4) converted into a paid-up addition to the sum insured hereunder. Any dividends due and unpaid at the maturity of this policy shall be payable with the sum herein insured to the payee of such insurance.

"Whenever the reserve hereon, with any accumulated dividends credited and the cash value of any paid-up additions hereto, shall equal the reserve on a fully paid-up policy of this same kind and amount for the then age of the insured at nearest birthday, upon request by the insured or his assigns and release of such dividends and paid-up additions, if all premiums then due shall have been paid as herein provided, the company will indorse this policy as fully paid up upon presentation hereof at its office in Hartford, Connecticut. Whenever the cash value of this policy and of any paid-up additions hereto, together with any accumulated dividends credited hereon, shall equal the full amount of this policy, then or thereafter, during the lifetime of the insured, upon surrender hereof and release of such dividends and paid-up

additions at such office, the company will pay to the insured or his assigns the face of the policy as a matured endowment, less any indebtedness to the company on or secured hereby.

"If any premium or installment of premium be not paid as herein provided, and if there be at the expiration of the time herein provided for such payment accumulated cash dividends credited on account of this policy at least equal to the payment required, if the company be so previously directed in writing by the payee of such accumulations, said payment shall be made by the application of an equal amount of such credit, or if such credit be less than the required payment then out of such credit, if sufficient, shall be paid a semiannual or quarterly installment of the annual premium."

From July 1, 1910, to February 19, 1913, the words "extended insurance" replace the words "a paid up" in policies which provide for extended insurance rather than paid-up insurance.

The plaintiff has been sending and now sends a premium notice to its members prior to the due date of the premium, the material part of which notice is as follows:

"The next payment on policy No. ...... will be due on the ...... day of ......, 19.., as follows:
Amount of installment of premium due.........................$ ......
Less dividend (allowed only if renewed).......................... ......

Cash payment................................................... $......"

Upon payment of the required premium the following form of statement of account and receipt is executed:

| No. ...... | | Due the Connecticut Mutual Life Insurance Company, |
|---|---|---|
| Annual premium, $ | | in cash, at its office in Hartford, Conn., on the ...... day of ......, payment as stated in the margin to continue policy No. ......, subject to its terms and conditions, on the life of ...... in force for one year from that date. |
| Less dividend, | | |
| Cash payment, $ | | Authority is hereby given to ...... to receive the stated amount, and receipt for the same hereon. |

| Received amount as above, and the charge for delay of $......, this ...... day of ......, 19.. ................................ | | Wm. H. Deming, Secretary. |

Plaintiff on December 31, 1909, had outstanding insurance amounting to $175,348,671.21 written on the annual dividend plan, $8,843,-658 on the nonparticipating, and $355,522 with post mortem dividend only. Its business had so increased that on December 31, 1910, it had outstanding $183,846,413.72 of annual dividend business, $7,669,-841 nonparticipating, and $352,022 with post mortem dividend only, represented by 77,369 policy holders in 1909 and 80,097 policy holders in 1910. The company, however, for several years past has written and now writes only participating policies; the nonparticipating policies now in force being confined to policies issued for paid-up insurance upon surrender of premium-paying policies where premiums were defaulted, and certain policies of so-called "term insurance."

Section 3529 of the General Statutes of Connecticut (as amended by Pub. Acts 1903, c. 19, § 2) provides among other things that:

"Payments in the form of dividends, or otherwise, shall not be made to its stockholders by any life insurance company organized under the laws of this state, unless its assets exceed by the amount of such payment the amount of its paid-up capital stock and all of its liabilities, including its reinsurance reserve upon policies issued before January 1, 1901, computed upon the basis of the actuaries' or combined experience table of mortality with compound interest at four per centum per annum, and upon policies issued after said date computed upon the American experience table of mortality with compound interest at three and one-half per centum per annum; and no payment shall be made to the policy holders of any such company except for matured claims and in the purchase of surrendered policies, unless the assets of such company exceed by the amount of such payments its liabilities, including its reinsurance reserve, computed as above provided in this section."

Section 3538 (as amended by Pub. Acts 1907, c. 193, § 1) provides that:

"No life insurance company doing business in this state shall make or permit any distinction or discrimination in favor of individuals between insurants of the same class and expectation of life in the amount or payment of premiums or rates charged for policies of life or endowment insurance, or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of the contracts it makes; nor shall any such company or any agent, subagent, broker, or any other person, make any contract of insurance or agreement as to such contract, other than is plainly expressed in the policy issued thereon; nor shall any such company or agent, subagent, broker, or any other person, pay or allow, or offer to pay or allow, as inducement to insurance, any rebate of premium payable on the policy or any special favor or advantage in the dividends or other benefit to accrue thereon, or any valuable consideration or inducement whatever not specified in the policy of insurance. No person shall receive or accept from any company or agent, subagent, broker, or any other person, as inducement to insurance, any such rebate of premium payable on the policy, or any special favor or advantage in the dividends or other benefit to accrue thereon, or any valuable consideration or inducement not specified in the policy of insurance."

Section 3527 of the General Statutes of Connecticut provides that:

"Every life insurance company chartered by this state shall, on or before the first of March in each year, render to the insurance commissioner a report, signed and sworn to by its president and secretary, of its condition upon the preceding thirty-first of December, which shall include a detailed statement of its assets and liabilities on that day; the amount and character of business transacted, moneys received and expended during the year; a descriptive list of all policies and contracts of insurance in force on that day; and such other information as the commissioner may deem necessary."

In compliance with the last-mentioned section of the statutes the plaintiff has been accustomed to file an annual statement with the insurance commissioner of Connecticut upon blanks prepared and furnished by him, covering in detail its financial condition and business operations. In the statement of income and disbursements, as called for on said forms, plaintiff has been required to report various facts which include duplications and cross-entries. Said forms also provide for statements under headings, "Ledger Assets," "Non-Ledger Assets," and "Liabilities, Surplus, and Other Funds."

In its reports to the state insurance commissioner for the years 1909 and 1910, plaintiff reported the following income and sources thereof, viz.:

|  | 1909. | 1910. |
|---|---|---|
| 1. First year's premiums on original policies without deduction...................... | $543,926 42 | $626,831 57 |
| 2. Surrender values applied to pay first year's premiums ............................. | 1,196 31 | 1,528 95 |
| 3. Dividends applied to purchase paid-up additions and annuities...................... | 892 71 | 2,220 67 |
| 4. Surrender values applied to purchase paid-up insurance and annuities.................. | 46,811 50 | 26,700 29 |
| 5. Consideration for original annuities involving life contingencies......... .................. | 28,175 19 | 8,392 25 |
| 6. Consideration for supplementary contracts involving life contingencies.................. | 398 25 | 469 06 |
| 7. Total new premiums....................;........ | $621,400 38 | $666,142 79 |
| 8. Renewal premiums, without deduction.......$4,428,125 65 | $4,428,125 65 | $4,583,723 47 |
| 9. Dividends applied to pay renewal premiums.. | 918,293 08 | 906,860 57 |
| 10. Surrender values applied to pay renewal premiums ................................. | 3,000 55 | 1,291 46 |
| 11. Total renewal premiums..................... | $5,349,419 28 | $5,491,875 29 |
| 12. Total premium income...................... | $5,970,819 66 | $6,158,018 29 |
| 13. Consideration for supplementary contracts not involving life contingencies............ | 2,010 88 | 5,677 95 |
| 14. Dividends left with the company to accumulate at interest.......................... | 197,411 88 | 204,331 50 |
| 15. Gross interest on mortgage loans............. | 1,169,867 89 | 1,231,088 90 |
| 16. Gross interest on land contracts............. | 14,418 07 | 38,595 69 |
| 17. Gross interest on deferred cash payments on real estate sold......................... | | 166 30 |
| 18. Gross interest on bonds, and dividends on stocks ............................... | 1,292,333 36 | 1,206,846 29 |
| 19. Gross interest on premium notes, policy loans, or liens.................................. | 208,993 98 | 249,607 05 |
| 20. Gross interest on deposits in trust companies and banks............................ | 20,686 84 | 18,503 86 |
| 21. Gross discount on claims paid in advance.... | 4,503 19 | 1,035 41 |
| 22. Gross interest on other debts due the company | 489 11 | |
| 23. Gross rents from company's property, including $35,000 for company's occupancy of its own buildings............................ | 379,788 63 | 309,329 65 |
| 24. Total gross interest and rents............... | $3,091,081 07 | $3,055,173 15 |
| 25. Payments made to agents corrected.......... | | 446 52 |
| 26. Suspense account, unadjusted monthly payments on land contracts.................... | 24,921 51 | |
| 27. Refund on surety bond...................... | 57 06 | |
| 28. Agents' balances previously charged off....... | 1 88 | |
| 29. Gross profit on sale or maturity of ledger assets, viz.:............................. | | |
|   Real estate.............................. | 60,225 39 | 23,573 12 |
|   Bonds ................................. | 8,251 77 | 164,094 62 |
| 30. Gross increase, by adjustment, in book value of ledger assets, viz.:.................... | | |
|   Bonds (for accrual of discount)........... | 7,643 96 | 5,583 19 |
| 31. Total income.............................. | $9,362,425 06 | $9,616,898 34 |

The second, fourth, tenth, and thirteenth items of each of the income columns of the plaintiff's reports for these years represented no

actual receipts by the company and were offset by corresponding cross-entries on the disbursement side of the account.

The amounts represented by the third item, "Dividends applied to purchase paid-up additions and annuities," and by the fourteenth item, "Dividends left with the company to accumulate at interest," were also included in the eighth item, "Renewal premiums without deduction," with the result that, although the company actually received these several amounts but once, they were twice accounted for in the footing of total income; the duplication being corrected by cross-entries on the disbursement side of the account.

The ninth item, "Dividends applied to pay renewal premiums," entered both in the income and disbursement columns of the respective reports, represents as a matter of fact no pecuniary transaction, and merely shows the amount of reductions of which participating policy holders availed themselves when making payment of their renewal premiums during these years. In other words, it is the amount of the difference between the maximum premiums contained in their policy contracts and the amounts required of them and which they actually paid as renewal premiums, and the amounts represented thereby appear in the respective reports purely as a matter of bookkeeping.

Among the entries made on the disbursement side of plaintiff's said reports were the following items, viz.:

| | 1909. | 1910. |
|---|---|---|
| Gross decrease, by adjustment, in book value of ledger assets, viz.: | | |
| Real estate............................................ | $132,971 22 | |
| Bonds (for amortization of premium)......... | 16,383 05 | $12,987 03 |
| Gross loss on sale or maturity of ledger assets, viz.: | | |
| Real estate............................................ | 239,661 06 | 182,850 00 |
| Bonds ................................................... | 2,348 41 | 5,590 98 |
| Mortgage loan......................................... | 200 00 | |
| Dividends paid policy holders in cash........... | 301,856 06 | 293,711 74 |
| Dividends and interest thereon held on deposit surrendered during the year.......................... | 33,474 05 | 73,716 60 |
| Furniture, fixtures, and safes....................... | 7,934 09 | 1,872 73 |
| Repairs and expenses (other than taxes) on real estate ................................................. | 230,035 35 | 174,440 74 |

Under the head of "Non-Ledger Assets" the following items, with others, are entered, viz.:

| | 1909. | 1910. |
|---|---|---|
| Interest on mortgages: | | |
| Due ..................................................... | $ 15,121 46 | $ 13,621 81 |
| Accrued ................................................ | 573,852 72 | 772,840 82 |
| Interest on bonds: | | |
| Due ..................................................... | ... .. | ... .. |
| Accrued ................................................ | 291,825 40 | 248,317 63 |
| Interest on premium notes, policy loans, or liens | | |
| Due ..................................................... | 149,214 50 | 149,023 57 |
| Accrued ................................................ | 9,379 21 | 7,484 57 |
| Interest on land contracts: | | |
| Due ..................................................... | 2,895 18 | 2,601 83 |
| Accrued ................................................ | 12,740 06 | 11,843 29 |
| Market value of bonds and stocks over book value.. | 197,566 62 | 434,165 75 |

|  | 1909. | 1910. |
|---|---|---|
| Gross premiums due and unreported, on paid-for policies in force December 31st: | | |
| New business.............................. | $ 3,387 10 | $ 6,658 12 |
| Renewals ................................. | 126,391 39 | 151,705 75 |
| Gross deferred premiums: | | |
| New business.............................. | 54,220 44 | 62,448 91 |
| Renewals ................................. | 417,833 29 | 437,665 20 |
| Net uncollected and deferred premiums: | | |
| New business.............................. | 46,086 03 | 55,285 62 |
| Renewals ................................. | 435,379 74 | 471,496 76 |

Under the heading "Liabilities, Surplus, and Other Funds" there are several entries of items, among them the following, viz.:

|  | 1909. | 1910. |
|---|---|---|
| Premiums paid in advance........................ | $31,542 73 | $ 32,669 16 |
| Unearned interest and rent...................... | 95,544 52 | 115,786 45 |

Although plaintiff, in its reports to the insurance commissioner of Connecticut, stated its total gross income for 1909 as $9,362,425.06, and for 1910 as $9,616,898.34, nevertheless in the return which it made to the Commissioner of Internal Revenue for these years it stated its gross income for 1909 as only $8,034,874.12, and for 1910 as $8,238,554.09. But in the return for 1909 it failed to include the amounts of certain items which it had listed as income in its report to the state insurance commissioner for that year, viz., the item:

Gross profit on sale or maturity of ledger assets, viz.:
Real estate.................................$60,225 39
Bonds ...................................... 8,251 77  $68,477 16

—the amount of which profit items represents the difference between their book value and the amount that plaintiff received from sale thereof (though, in relation to the bonds, the amount received on sale was but $1,433 above their market value on December 31, 1908); the item, "Gross increase, by adjustment, in book value of ledger assets, viz.: Bonds (for accrual of discount), $7,643.96"; the item, "Dividends applied to pay renewal premiums, $918,293.08" (entered on both income and disbursement sides of the report to the state insurance commissioner for that year); and the amount of $15,320.27, representing certain dividends left with plaintiff in previous years by policy holders, on deposit (and subject to be withdrawn in cash at any time), and the amount of which plaintiff during the year 1909 applied to the payment of premiums at the request of the policy holders, although the amount of this item plaintiff included in the item "Renewal premiums, without deduction," appearing in its report made to the state insurance commissioner in 1910.

The Commissioner of Internal Revenue, however, by a first amendment to plaintiff's gross income return, added the amounts of the items, "Dividends applied to pay renewal premiums, $918,293.08;" "Dividends left with plaintiff" (in previous years and applied in 1909 to the payment of premiums), "$15,320.27;" "Gross profit on sale of ledger assets, $68,477.16;" and "Dividends applied to purchase paid-up additions and pure endowment, $892.71" (although this last item had been accounted for in plaintiff's return)—thereby increasing the amount of plaintiff's gross income for 1909 to $9,037,857.34.

Plaintiff in its return for that year had claimed deduction items totaling $8,233,192.52 (exclusive of the $5,000 exemption allowed by the act), among which were the following items, appearing on the disbursement side of its statement to the Connecticut insurance commissioner, as "Gross loss on sale or maturity of ledger assets, viz.: Real estate, $239,661.06; Bonds, $2,348.41; Mortgage loan, $200.00;" "Gross decrease, by adjustment in book value of ledger assets, viz.: Real estate, $132,971.22" (representing the claimed depreciation on a piece of property in Milwaukee known as the "Goldsmith property," which the plaintiff had agreed to sell at that much less than its cost to the company, who had acquired it by foreclosure proceedings in 1905); and $7,934.09, disbursed for furniture, fixtures, safes, and repairs to plaintiff's home office; but of these the Commissioner refused to allow as deductions the amount of the disbursement for furniture, fixtures, safes, and repairs, $7,934.09; $227,437.06 of the $239,661.06 claimed for loss on sale of real estate; and $99,728.42 of the claimed depreciation on the "Goldsmith property." He did however, allow as a reduction $16,383.05, representing the item "Gross decrease, by adjustment, in book value of ledger assets, viz.: Bonds (for amortization of premium)," which item, although entered on the disbursement side of plaintiff's report to the insurance commissioner of Connecticut, plaintiff had failed to claim as a deduction item in its return of income to the Internal Revenue Commissioner, which would make a net disallowance of claimed deductions to the extent of $318,716.68, but this was figured by the Commissioner as $318,726.52.

By a second amendment the Commissioner of Internal Revenue added to the gross income the sum of $5,583.19 on account of the item "Gross increase, by adjustment, in book value of ledger assets, viz.: Bonds (for accrual of discount)," although the actual amount thereof for 1909 was $7,643.96; $21,705.04 on account of the "Non-Ledger Assets, deferred and uncollected premiums," and $63,035.09 for "Interest due and accrued" and "premiums and interest paid in advance"; the amount of the last two items having been accounted for in the income column of plaintiff's statement to the insurance commissioner of Connecticut for the year 1908. The Commissioner of Internal Revenue also made a further change in the return by reducing the amount of $60,225.39, which he had by his first amendment added to the gross income on account of the item "Gross profit on sale or maturity of ledger assets, viz.: Real estate," to $7,383.39, having deducted therefrom $52,842 by prorating the profits over the number of years which the company had held the several pieces of real estate sold by it at a profit in 1909. In this way the amount of gross income was increased to $9,075,338.21, and its net income for that year for taxation purposes made to appear as $1,155,862.66.

In its return made to the Commissioner of Internal Revenue for 1910 plaintiff did not include as part of its gross income for that year certain items appearing in the income column of its statement for 1910 to the insurance commissioner of Connecticut, viz.: "Dividends applied to pay renewal premiums, $906,860.57" (entered once as an item of income and also as a disbursement item in said report);

"Gross profit on sale or maturity of ledger assets, viz.: Real estate, $23,573.12; Bonds, $164,094.62;" "Gross increase, by adjustment, in book value of ledger assets, viz.: Bonds (for accrual of discount), $5,583.19,". and "Payments made to agents corrected, $446.52."

To the $8,238,554.09 returned as gross income for 1910 the Commissioner added the amounts of the items "Surrender values applied to pay new premiums, "$1,528.95;" "Dividends applied to purchase paid-up additions and annuities, $2,220.67;" "Surrender values applied to purchase paid-up insurance and annuities, $26,700.29;" "Dividends applied to pay renewal premiums, "$906,860.57;" "Surrender values applied to pay renewal premiums, $1,291.46;" "Consideration for supplementary contracts not involving life contingencies, $5,677.-95" (representing a death claim and accumulations left with plaintiff to be paid in installments as requested by a policy holder before death), an item appearing on both income and disbursement sides of plaintiff's report to the insurance commissioner of Connecticut; "Gross discount on claims paid in advance, $1,035.41;" "Rent from company for occupancy of its own buildings, $35,000;" "Gross profits on sales of real estate, $6,767" (amount of this item in report to insurance commissioner being $23,573.12); "Gross profits on sales of bonds, $164,-314.62" (appearing as $164,094.62 in the statement to the commissioner of insurance); "Bonds (for accrual of discount), $5,583.19;" "Deferred and uncollected premiums" and "Premiums paid in advance." $28,864.95; "Accrued and overdue interest" and "Interest paid in advance (in 1909 and accounted for in that year's report to the insurance commissioner of Connecticut), $127,963.85;" "Surrender values applied to pay renewal premiums, $1,291.46;" "Surrender values applied to purchase paid-up insurance and annuities, $26,700.29," and $226.52, supposed to represent the item "Payments made to agents corrected, $446.52," entered in the income column of plaintiff's report to the insurance commissioner of Connecticut—the amount of these additions being $1,314,035.43, making the total gross income for 1910, as amended, $9,552,589.52.

In its return of income for 1910 plaintiff had claimed for deduction items amounting to $8,090,744.58 (exclusive of the $5,000 exemption allowed by the act), among which were the items "Loss on sale of real estate, $182,850," and "Loss on bonds sold, $5,590." The Commissioner, however, disallowed $166,357.72 of the deduction claimed for loss on sale of real estate and the whole of the amount claimed for loss on bonds sold. He also disallowed $1,383.49 of the deduction claimed on "addition to reserve," but by then deducting $35,103.89 of the amount which he had previously added as gross income, covering the items of surrender value applied to payment of premiums, and the purchase of paid-up insurance and annuities amounting to $29,-520.70, and the item, "Bonds (for accrual of discount), $5,583.19," the net amount of items disallowed was $138,228.30, and the amount of net income for taxation purposes for that year was computed at $1,-595,072.24.

So as to avoid any misunderstanding as to the items in dispute, and as to the amounts and dates of payment of the taxes sought to

be recovered, counsel for the parties entered into the following stipulation:

United States District Court, District of Connecticut.

The Connecticut Mutual Life Insurance Company v. Robert O. Eaton, Collector.

At Law—No. 1710.

Stipulation.

In the above-entitled cause it is stipulated and agreed that the following is a correct statement of the amounts of the several items as to which the parties are at issue and of the several amounts which the complainant would be entitled to recover if its respective claims be sustained:

In connection with complainant's income for year 1909:

Commissioner's First Amendment of Return.

| | | |
|---|---:|---:|
| Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut as contained in Connecticut Insurance Report of 1910 (Government's Exhibit II), page 81, as "Dividends applied to pay renewal premiums: [1] ($933,613.35—$15,320.27)............... | | $918,293 08 |
| Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut as contained in Connecticut Insurance Report (Government's Exhibit II), page 81, as "Dividends applied to purchase paid-up additions and annuities"........................... | | 892 71 |
| Items added to gross income, which the complainant does not contest: | | |
| [1] Amount of premiums paid by application to cash credits ................................$ | 15,320 27 | |
| Book profits on sale or maturity of bonds........ | 8,251 77 | |
| Book profit on sale of real estate (prorated in second amendment and reduced to $7,383.39)...... | 60,225 39 | 83,797 43 |
| Amount expended by complainant in office repairs, etc., and excluded by the Commissioner from the item of "the ordinary and necessary expenses of maintenance and operation of the business and properties of the corporation" (including $5,318.82 for alterations in home office). Balance, $2,615.27, not contested by government............................. | | 7,934 09 |

Commissioner's Second Amendment of Return.

| | | |
|---|---|---:|
| Net amount added to gross income as result of computing net income on so-called revenue basis: Premiums, $21,705.04; interest, $63,035.09...................................... | | 84,740 13 |
| Net amount of decrease in net income due to inclusion of items "Accrual of discount," $5,583.19, and "Amortization of bond values," $16,383.05, not contested................. | | 10,799 86 |
| Net amount of increase in net income due to prorating losses on sales of real estate ($227,437.06) plus prorated book loss on one parcel contracted for sale ($99,728.42), less prorated profits on sales of real estate ($52,842.00)...............$274,323 48 | | |

[1] Note of Explanation.—The total amount of the item added by the Commissioner, to wit, $933,613.35, included $15,320.27, dividends credited to policy holders in prior years and left with the company on deposit, subject to withdrawal at any time in cash. These cash credits were at the request of policy holders applied to the payment of premiums paid in 1909, and the complainant does not contest the inclusion in the company's gross income of these cash credits so applied. In the complainant's financial statement as contained in Connecticut Insurance Report of 1910 (Government's Exhibit II) the amount of $15,320.27 is included in the item "Renewal premiums without deduction."

On account of the first amendment to the complainant's return, the complainant, on May 3, 1911, paid a tax of $8,075.99, and if the above described item of $918,293.08 was erroneously included, then the complainant is entitled to recover the amount so paid, to wit, $8,075.99, with interest from said May 3, 1911.

On account of the second amendment, the complainant, on February 5, 1912, paid an additional tax of $3,482.64. If all the complainant's claims are sustained the complainant would be entitled to recover the amount so paid with interest from said February 5, 1912 (as the corrections in the return which are conceded by the complainant would not have resulted in any taxable net income), or if all the complainant's claims are sustained except the claims as to revenue basis items ($84,740.13), as to item of office repairs, etc. ($7,-934.09), and as to item described as "Dividends applied to purchase paid-up additions, etc." ($892.71), or as to any of said three items, then the complainant would be entitled to recover the amount so paid, to wit, $3,482.64, as the disallowance of the complainant's claims as to all of said three items would not result in any taxable net income.

If the complainant is not entitled to deduct its full book losses on sales of real estate, and the Commissioner's method of prorating the book losses and profits on sales of real estate is sustained (the complainant's other claims being sustained), then the taxable net income of the complainant, less specific deduction of $5,000, would be $144,002.65, and complainant should recover on account of its second payment the difference between said second payment of $3,482.64 and the correct amount of its liability, $1,440.03, to wit, $2,042.61, with interest from February 5, 1912.

If the Commissioner's method of prorating the real estate losses and profits is sustained, and the claims of the complainant as to the following items, or any of them, are disallowed, the amount so recoverable by the complainant on account of its second payment should be said amount of $2,042.61, less the amounts set opposite said items respectively:

Item described as "Dividends applied to the purchase of paid-up
additions, etc." ($892.71).....................................$   8 92
Item of office repairs, etc. ($7,934.09 less $2,615.27, not contested
by government)...............................................   53 19
Item resulting from computation on so-called revenue basis ($84,-
740.13) ...................................................$847 40

If the government's claim as to the inclusion in gross income of the above described item of $318,293.08 is sustained, and if any of the complainant's claims as to any of the following items are allowed, then the amounts recoverable would be the respective amounts set opposite said items, with interest thereon from the date of the payment covering the particular items:

Item described as "Dividends applied to purchase paid-up additions, etc." ($892.71).....................................$    8 92
Item of office repairs, etc. ($7,934.09)..........................   79 34
Item resulting from computation on so-called revenue basis
($84,740.13) .............................................  847 40
Item resulting from prorating losses and profits on sale of real
estate, etc. ($274,323.48)................................  2,743 23

In connection with the complainant's income for 1910:
Amount of addition to net income conceded by
complainant (excepting all cross-entries):
Book profit on sale of real estate...............$  6,767 00
Agents credit balances........................       226 52
Reduction in net addition to reserve...........     1,383 49
Book profit on sale of bonds...................   164,314 62   172,691 63

Amount of addition to net income on account of the
following items, the complainant's claims as to
which are not contested by the government:
Consideration for supplemental contracts, etc...$  5,677 95
Gross discount on claims paid in advance........     1,035 41
Home office, book rental.....................    35,000 00
Loss on bonds sold..........................     5,590 98    47,304 34

Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut as contained in Connecticut Insurance Report of 1911 (Government's Exhibit III), page 77, as "Dividends applied to pay renewal premiums"......$906,860 57

Amount added to gross income on account of item described in complainant's financial statement made to the insurance commissioner of Connecticut as contained in Connecticut Insurance Report of 1911 (Government's Exhibit III), page 77, as "Dividends applied to purchase paid-up additions and annuities" ................................................ 2,220 67

Net amount added to gross income as result of computing net income on so-called revenue basis: Premiums, $28,864.95; Interest, $127,963.85...................................... 156,828 80

Net amount of increase in net income due to prorating losses on sale of real estate.................................. 166,357 72

On account of the amendment to the complainant's return, the complainant on February 5, 1912, paid a tax of $14,522.64.

By reason of the items not contested by the government, to wit, $47,304.34, the complainant is entitled to recover $473.04, with interest from said February 5, 1912.

If the above described item of $906,860.57 was erroneously included, then the complainant would on account thereof be entitled to recover $9,068.60, with interest as above.

If the item described as "Dividends applied to purchase paid-up additions and annuities," to wit, $2,220.67, was erroneously included, then the complainant would on account thereof be entitled to recover $22.20, with interest as above.

If the so-called revenue basis items (net addition, $156,828.80) were erroneously included, the complainant would on account thereof be entitled to recover $1,568.28, with interest as above.

If the complainant is entitled to deduct the full amount of its book losses on sales of real estate, and the Commissioner's method of prorating such losses is erroneous (net increase, $166,357.72), then the complainant would on account thereof be entitled to recover $1,663.57, with interest as above.

The Connecticut Mutual Life Ins. Co.,

By Robinson, Robinson & Cole, Its Attys.

The Defendant,

By Frederick A. Scott, U. S. Attorney.

It will be noticed that the plaintiff in this case is, like the plaintiff in Mutual Benefit Life Insurance Co. v. Herold (D. C.) 198 Fed. 199, 218, and 201 Fed. 918, a strictly mutual company, and conducts its business in a manner very similar to the plaintiff in that case, except that it makes no book charge against itself of the amounts of the so-called "dividends" in favor of policy holders who only obtain the benefit of these allowed reductions (for prior excessive premium payments) when making payments of renewal premiums, at which time the amount of these dividends are credited to them in either of the ways permitted by their policy contracts, and in that case, as in Connecticut General Life Ins. Co. v. Eaton, Collector, supra, a good share of the controversy herein has centered around the questions as to what are and what are not "taxable dividends" under the act in question.

Notwithstanding the claims of the parties set forth in the pleadings, in view of the stipulation which the parties have entered into, it becomes necessary for the court to pass only upon those questions which

have been raised concerning the controverted items shown by the stipulation.

[1] The items, "Dividends applied to pay renewal premiums," amounting to $918,293.08 in 1909, and $906,960.57 in 1910, do not represent "income received by plaintiff," nor do they represent "dividends paid to policy holders," as the term "dividends" was intended to be understood by the act in question, and therefore the Commissioner erred in adding these items to the plaintiff's respective returns of gross income. Mutual Benefit Life Insurance Co. v. Herold, supra; Connecticut General Life Insurance Co. v. Eaton, Collector, supra.

The amount of the items, "Dividends applied to purchase paid-up additions and annuities," $892.71 in 1909, and $2,220.67 in 1910, represent "income received," and were properly included in plaintiff's respective original returns of gross income for those years. Having been thus once accounted for as income, it was error on the part of the Commissioner to again add the amounts thereof to the plaintiff's gross income returns.

[2] The amount of $5,318.82 expended for alterations in plaintiff's home office appears to have been disbursed solely with a view of facilitating the carrying on of plaintiff's business, and to have been well within the provisions of the first part of the second paragraph of section 38 of the act.

The changes made in the office do not appear to have been such as to be properly included under the head of "permanent improvements," "alterations," or "betterments," tending to enhance the rental or market value of the building in case of sale. It should be remembered, also, that in these days of up-to-date business method requirements it often becomes necessary for business concerns to change the layout and appointments of the places wherein they carry on business, with a view to economy in space, a saving of unnecessary labor, and the bettering of working conditions of employés, to the end that a net saving of running expenses will result. In view of the consistent expansion of plaintiff's business, which the evidence shows, it would seem that the amount expended for the changes made in the office ought not, under the circumstances, to be considered unreasonable or unusual, and that therefore the amount claimed might well have been allowed as an item of deduction.

It seems to the court that business concerns, in matters of this kind, should be allowed a reasonable discretion, and the law so enforced as to help rather than to hinder them in making reasonable progress in the development of their business, for it must appear to any one giving the matter a moment's consideration that the more successful the business the larger the results, even from the standpoint of taxes accruing to the government.

[3] In relation to the items "due and deferred, though uncollected, premiums" and "premiums paid in advance," on account of which the Commissioner added to the plaintiff's gross returns, $21,705.04 for 1909, and $28,864.95 for 1910, which, as well as those covering the items concerning "overdue and accrued, though uncollected, interest and rents," and "interest paid in advance," represent in the first instance the difference in the balances shown by the plaintiff's report to

the insurance commissioner of Connecticut as of December 31, 1908, and the balance of like items shown by its report as of December 31, 1909, and in the second instance the difference between the balance of December 31, 1909, and that of December 31, 1910, the testimony is that, in so far as concerns the amount added on account of the "uncollected premium" items for 1909, no income in fact was received thereon by the company during that year, nor any part of the like addition for 1910 during that year. It also appears that the company still stands a chance of never receiving a large part of the amount of the additions so made, although the items and the amounts thereof are required to be reported in plaintiff's annual statements to the insurance commissioner as "non-ledger assets," because of the form of reports which the insurance commissioner furnishes. The testimony further shows that, whatever payments are received from these sources of revenue, such payments are duly entered and returned as income for the year when received, that the "advance premium payments" made in 1908 on policy premium payments due in 1909 were included in the income reported for 1908, and that all advance payments made in 1909 on account of premiums due in 1910 were included in plaintiff's income return for 1909.

The same is likewise true of the amounts of the items of "overdue, accrued and uncollected, interest and rents," and of the item "interest paid in advance," on account of which the Commissioner added $63,035.09 to the income return for 1909 and $127,963.25 for 1910; for, while plaintiff is obliged to include a statement concerning these items in its annual reports to the insurance commissioner of the state, they actually form no part of its income until paid, at which time the payments are duly entered and reported as income.

In all but the first one of the acts which Congress has passed relative to taxing income (viz., Act August 5, 1861, c. 45, 12 Stat. 292, 309, confined to incomes of individuals), it was provided that the tax be levied upon either the "gross amount of receipts," the "annual gains, profits or income," the "annual gains, profits and income," or upon the "gains, profits and income"; while the act now being considered provides that the tax be levied upon the "entire net income over and above five thousand dollars received during such year." It will also be noticed that in such prior acts provision was made that "interest received or accrued" upon notes, bonds, mortgages, or other forms of indebtedness bearing interest, "whether paid or not, if good and collectible," be included in estimating the "annual gains, profits or income" on which to levy the tax, while the section of this act contains no such provision.

In view of this fact it would seem as though the intention of Congress was that the levying of the tax be confined to such gross income only, i. e., receipts, less allowable deductions, as were actually received during the year, and that therefore the amounts added by the Commissioner covering items stated (because they do not represent income actually received during the respective years) were erroneously added. Mutual Benefit Life Ins. Co. v. Herold, supra; Connecticut General Life Ins. Co. v. Eaton, Collector, supra.

[4] The Commissioner's action in adding to the gross income re-- turns which plaintiff filed certain amounts on account of profits realized upon sales made of real estate during the years 1909 and 1910, and disallowing a .large portion of the deductions claimed for losses on like sales of real estate, including the amount claimed as loss for depreciation of the "Goldsmith property," presents for solution quite a difficult question.

Some of the previous acts passed by Congress, similar to the one in question, contained provisions relating to the estimating as income profits realized from sales of real estate, and some of them also provided for an allowance as a deduction of the losses resulting from sales of real estate, as witnessed by Act June 30, 1864, c. 173, § 116, 13 Stat. 281, wherein it was provided that in estimating income the "net profits realized by sales of real estate purchased within the year for which income is estimated, shall be chargeable as income"; Act March 3, 1865, c. 78, § 1, 13 Stat. 479, that "net profits realized by sales of real estate purchased within the year for which income is estimated shall be chargeable as income, and losses on sales of real estate purchased within the year for which income is estimated shall be deducted from the income of such year"; Act March 2, 1867, c. 169, § 13, 14 Stat. 478, that "profits realized within the year from sales of real estate purchased within the year or within two years previous to the year for which income was (is) estimated;" shall be assessed as part of the income for that year; Act July 19, 1870, c. 255, § 7, 16 Stat. 257, 'that "in estimating the gains, profits and income * * * there shall be included * * * profits realized within the year from sales of real estate purchased within two years previous to the year for which income is estimated"; and Act Aug. 28, 1894, c. 349, § 28, 28 Stat. 553, that "in estimating the gains, profits, and income of any person there shall be included * * * profits realized within the year from sales of real estate purchased within two years previous to the close of the year for which income is estimated"—while the only provision contained in the act now in question (in so far as concerns deductions allowed for losses) reads "all losses actually sustained within the year, and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any." It therefore becomes necessary to ascertain just what was intended by the wording of this part of the statute.

Plaintiff acquired title to all of the real estate in question .(about 132 parcels) through foreclosure proceedings, and had held title to some of it for as long a time as 30 years before making sale; the title to the "Goldsmith property" having been obtained some time during the year 1905, and the title. to none of these places after the year 1908. The properties represented the security given for mortgage loans which plaintiff had originally made thereon, and therefore were not properties purchased by plaintiff for use in the conducting of its business, nor obtained by it for speculation or investment purposes. The several pieces were, until sold, carried on the books of the company at a valuation shown by their cost to plaintiff on the books, and plaintiff always received therefrom, after taking title thereto, a net return on

the investment represented, although on some pieces this return did not average quite 2 per cent. a year. The properties were also listed as real estate forming a part of the company's assets when making annual reports to the insurance commissioners of the several states, at the valuation shown by the company's books, and no exception has ever been taken thereto by any state insurance commissioner, and the testimony shows that an appraisal of these properties was made under the direction of the insurance commissioner for the state of Connecticut in 1907, which appraisal shows slight advance over the book value of the properties.

While the act does provide for the deduction allowance of a reasonable sum for such depreciation of property as has actually taken place within the year, it seems hardly reasonable to believe that such a piece of property as the testimony shows the "Goldsmith property" to have been did depreciate in value to the extent of $132,971.22 within the year 1909, and especially is it so when it is remembered that plaintiff had acquired that piece of property only about four years previous to the time of sale at a cost so largely in excess of the selling price.

The court is therefore obliged to conclude that the amount thus claimed for deduction was unreasonable, and that the action of the Commissioner in allowing only $33,242.80 of the claim was fair and just under the circumstances, and that this action in relation thereto should be upheld.

There seems to be no limitation provided in the act as to the amount of deductions to be allowed for losses actually sustained from any source during the year, and whether due to conditions of business, the sale of property, or anything else, and the court must therefore assume that the statute contemplated that the full amount of all losses sustained within the year would be allowed.

The testimony having failed to disclose that the respective amounts claimed for deduction on account of losses sustained by the sales of real estate did not in fact represent actual losses caused to plaintiff thereby within the respective years for which they were claimed, the court must assume that the claimed losses were actually sustained, and for this reason plaintiff must be allowed deductions to the full amount of these losses.

Were the plaintiff a stock corporation, the question might arise as to whether the profits which plaintiff had realized from sales of real estate, the title to which it had obtained previous to the time the act came into operation, should be considered as an addition to its capital, or a part of its yearly income, and, on the other hand, whether the losses sustained by like sales did not in fact represent a diminution of capital, and not such items of actual loss within the year as the act intended should be allowed as deductions when ascertaining the yearly net income for taxation urposes.

The plaintiff being a strictly mutual life insurance company, without capital stock, and no question arising in the case concerning division of any profits accruing from the sales of real estate, the court has not been called upon to decide questions like those which were

raised before Judge Lowell in the United States Circuit Court, District of Massachusetts, in the case of Merchants' Insurance Co. v. McCartney, Fed. Cas. No. 9,443.

In view of the above the issues are found in favor of the plaintiff on the following contested items, viz.: "Dividends applied to pay renewal premiums, $918,293.08," under the first count, and the like item of $906,806.57, under the second count; "Dividends applied to purchase paid-up additions and annuities, $892.71, under the first count, and the like item of $2,220.67, under the second count; "Disbursements for alterations and furnishings in plaintiff's home office, $5,318.-82," under the first count; "Premiums, rents, and interest due and accrued, though uncollected," and "Premiums and interest paid in advance," computed on a revenue basis as $84,740.13, under the first count, and the like item of $156,828.80, under the second count; "Losses on sales of real estate, $239,661.06," under the first count, and $182,850, under the second count. And in favor of the defendant on these contested items, viz.: "Profits realized from sale of real estate during the year 1909, $60,235.39," under the first count, and the like item during 1910, $23,573.12, under the second count, and on account of "Depreciation claimed on 'Goldsmith property,' $99,728.-42," under the first count.

On the following uncontested items the issues are found for the plaintiff, viz.: "Disbursements made for furnishings, alterations, etc., in plaintiff's home office, $2,615.27," under the first count (being the balance of that item); "Consideration paid for supplemental contracts $5,677.95," under the second count; "Gross discount on claims paid in advance, $1,035.41," under the second count; "Rentals paid for use of home office, $35,000," under the said count; and "Losses by book on sale of bonds, $5,590.98," under said second count. And for the defendant on these items, likewise uncontested, viz.: "Premiums paid by application of cash credits (previously left with plaintiff), $15,320.27," under the first count; "Bonds for accrual of discount, $5,583.19," under the first count, and "Book profits on sale or maturity of bonds, $8,251.77," under the first count; "Agents' credited balances, $226.52," under the second count; "Reduction in net addition to reserve $1,383.49," under the second count; and "Book profits on sale of bonds, $164,314.62," under the second count.

It will be noticed that, notwithstanding the Commissioner of Internal Revenue ultimately decided to add to the respective gross income returns only the prorated amounts of the profits which plaintiff realized by sales of real estate in the years 1909 and 1910, instead of the full amount of profits accruing from such sales, this decision has given the government the benefit of the full amount of such profits, and this appears but simple justice, if the plaintiff, on the other hand, is to have the benefit by way of deduction items to the full extent of the losses which it sustained by like sales during these years, although the result will be the same to the plaintiff under the terms of the stipulation of counsel.

Most of the points raised in this case having been fully discussed in Mutual Benefit Life Insurance Co. v. Herold, supra, as well as in

Connecticut General Life Ins. Co. v. Eaton, Collector, which latter case was decided at this term of court, it hardly seems necessary to do more than to say that the opinion in the latter named case controls and should be read in connection with this decision.

Therefore the judgment of the court is that $1,894.98 of the amount which was paid as a tax on plaintiff's income for 1910 on account of items added to its return for 1910 by the Commissioner of Internal Revenue be retained, and that plaintiff recover of the defendant the remainder of the taxes thus paid, to wit, $12,627.66, with interest from February 5, 1912; also that plaintiff recover of the defendant the tax which it paid on account of items which the Commissioner of Internal Revenue added to its income return for 1909 (by his first amendment thereto), viz., $8,075.99, with interest from May 3, 1911, and that the plaintiff recover of the defendant the tax paid by plaintiff on account of items which the Commissioner of Internal Revenue added to its income return for 1909 (by his second amendment thereto), to wit, $3,482.64, with interest from February 5, 1912. Under the foregoing rulings, the plaintiff had no taxable income for 1909, and defendant can retain no part of the tax collected.

Decree accordingly.