### NORTHWESTERN MUT. LIFE INS. CO. v. FINK, Collector.

(District Court, E. D. Wisconsin. November 7, 1917.)

1. INTERNAL REVENUE ⬡═⬡9—CORPORATION TAX—MUTUAL INSURANCE COMPANY—"INCOME."

Corporation Tax Act Aug. 5, 1909, c. 6, 36 Stat. 112, § 38, imposes an excise tax on insurance companies equivalent to 1 per cent. on the entire net income above $5,000 received by such a company from all sources during the year, exclusive of amounts received as dividends on stock of other corporations, etc., subject to the tax, such income to be ascertained by deducting all losses not compensated by insurance or otherwise, including a reasonable allowance for depreciation, and sums other than dividends paid within the year on policy and annuity contracts, and the net addition, if any, required by law to be made within the year to reserve funds. *Held*, that so-called dividends of a mutual life insurance company doing business on the level premium plan, consisting merely of the portion of the premium charged in excess of the cost of insurance, returned annually to the policy holders after the first year, so far as they were used to reduce subsequent premiums, were not "income received," and were not subject to taxation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Income.]

---

⬡═⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. INTERNAL REVENUE ⟾9—CORPORATION TAX—MUTUAL INSURANCE COMPANY—TAX ON INCOME.

The fact that in the ascertainment and apportionment of dividends to its policy holders a mutual life insurance company acted obediently to St. Wis. 1915, § 1952, requiring mutual life insurance surpluses to be apportioned annually to policies, does not estop it as against the collector of internal revenue, or avail against its contention that such dividends were not income within Corporation Tax Act, § 38, imposing a tax of 1 per cent. on the entire net income of insurance companies above $5,000.

3. INTERNAL REVENUE ⟾9—CORPORATION TAX—MUTUAL LIFE INSURANCE COMPANY—PREMIUMS AND INTEREST NOT RECEIVED—INCOME.

A mutual life insurance company's tax return under Corporation Tax Act, § 38, imposing an excise tax on insurance companies of 1 per cent. on entire net income above $5,000, should not include premium and interest items accrued and due, but not actually collected and received.

4. INTERNAL REVENUE ⟾9—CORPORATION TAX—MUTUAL LIFE INSURANCE COMPANY—SUPPLEMENTARY CONTRACT

Where a mutual life insurance company had obligations on policies termed supplementary contracts, presenting the feature that, when a policy holder died, the beneficiary exercised an option to take the avails of the policy in installments, the general reserve fund was charged with a fixed liability, and the sum withdrawn therefrom and set aside to take care of the liability according to the deferred term covered by the option, the inclusion of such contracts, as exhibiting a reserve liability, in the calculation of the annual "net addition to reserve" which might be deducted from the gross income, was warranted under Corporation Tax Act, § 38.

5. INTERNAL REVENUE ⟾9—CORPORATION TAX—MUTUAL LIFE INSURANCE COMPANY—INTEREST ON POLICY LOANS—INCOME.

A mutual life insurance company is not under necessity to return as part of its gross income under Corporation Tax Act, § 38, imposing an excise tax on insurance companies of 1 per cent. of net income above $5,000, interest accruing on policy loans, as such loans and the interest are not obligations which the policy holder is bound personally to liquidate with interest.

6. INTERNAL REVENUE ⟾38—CORPORATION TAX—RECOVERY OF EXCESS TAX—FAILURE TO INCLUDE ITEM IN RETURN.

Under Rev. St. § 3225 (Comp. St. 1916, § 5948), brought into the Corporation Tax Act, and providing that, when a second assessment is made in case of any return which in the opinion of the collector was false or fraudulent, or contained any undervaluation, no tax collected under such assessment shall be recovered by any suit, unless it is proved that the return was not false or fraudulent, and did not contain any undervaluation, a mutual life insurance company's omission in good faith of an item from the income side of its corporation tax return, on account of treating such item as a suspense item, which upon later ascertainment would go into the return for the ensuing year, did not bar the company's failure to maintain action to recover back excessive taxes paid.

At Law. Action by the Northwestern Mutual Life Insurance Company against Henry Fink, Collector, etc. Judgment for plaintiff.

John Barnes and Sam T. Swansen, both of Milwaukee, Wis., for plaintiff.

H. A. Sawyer, U. S. Atty., of Milwaukee, Wis., for defendant.

GEIGER, District Judge. Plaintiff has brought this action for recovery of taxes alleged to have been illegally assessed and exacted

⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

under Corporation Excise Law Aug. 5, 1909, c. 6, § 38, 36 Stat. 112. The facts are not controverted, and such as give rise to the controversy may be thus summarized:

The plaintiff, in its attempt to comply with law, made return of its gross income for the years 1909 and 1910, making therein such deductions as it conceived were permitted. The Commissioner of Internal Revenue made a reassessment for each of the years, and added to the gross income on each of the returns certain items which he asserted—and which defendant now asserts—were and are items of taxable income, and he disallowed, on the other side of each return, items which were, and now are, asserted not to be proper items of deduction, under the law. Stated in greater detail, this may be said:

In its return for the year 1909, plaintiff stated its gross income at $43,297,167.27, ascertaining it, so the defendant claims, by deducting from the gross income return made for that year to the Wisconsin and New York insurance commissioners, viz. $49,445,142.94, the following items:

(1) Dividends applied to purchase paid-up additions to policies
    held by members.......................................... $1,215,878.56
(2) Dividends applied to pay renewal premiums of policies held
    by members .........................................      4,896,319.72
(3) Dividends left with company..........................        1,999.78
(4) Adjustment of assets.................................       33,777.61

    Making a total of...................................... $6,147,975.87

—which, when deducted from the insurance commissioner's return above noted, leaves the revenue return of $43,297,167.27 returned as stated. From this latter the company made deductions as follows:

(1) For expenses..........................................$ 5,253,153.46
(2) For losses ...........................................     2,308.92
(3) For payments on policy and annuity contracts.............  18,637,141.76
(4) Addition to reserve...................................   14,156,093.96
(5) Taxes paid...........................................      870,490.77

—making a total of deductions claimed in such return, $38,919,188.87, which, being deducted from the gross return of $43,297,167.27, left $4,377,978.40 as the net income, and upon which (less $5,000 exempted) the plaintiff paid the statutory 1 per cent. tax.

Thereafter the Commissioner of Internal Revenue proceeded to make a revision of the return and a reassessment of taxable income for the year 1909. It resulted in his adding to the gross income returned by the plaintiff the items of dividends paid for additions and renewal premiums, the amount of accrual of discount, two items, "interest income" and "premium income," due and accrued but not actually received, respectively. This brought the gross income to approximately the figure contained in the insurance commissioner's return for that year. Against this were allowed the items of expense, losses, payments on policy and annuity contracts, taxes, claimed by plaintiff; also an item, "depreciation" (covering in fact the annual reduction necessitated against securities purchased at a premium). He reduced the amount of "net addition to reserve funds," basing it upon disallowing funds set aside to meet contracts having deferred pay-

ments after death.   He also disallowed the dividend disbursement; and hence, without giving the figures in detail, he cast as a balance a taxable net income of $10,795,118.58—an excess of $6,381,140.18 over the plaintiff's return.   Upon this he levied, and plaintiff, under protest, paid, a tax of 1 per cent.—$63,811.40.

For the year 1910, plaintiff company's return was made in a similar manner.   This, too, was revised, and, excepting in certain minor respects, the revision and reassessment of income thereon presents the same questions as arise respecting the 1909 income and assessment. The excess upon such 1910 return and reassessment, found by the Commissioner of Internal Revenue, was $8,153,134, the 1 per cent. tax whereon was paid by plaintiff under protest.

This suit seeks recovery of the amounts so paid upon such reassessment for both years.   A summary of items involved appears to be:

On the charge side of the return:

(1) The dividends for both years aggregate................... $12,827,602.38
(2) The addition to premium income (accrued, but not paid)....   395,284.46
(3) The addition to interest income (accrued, but not paid) for the year 1910 only.......................................   169,649.54
(4) Interest on policy loans to members (paid out of reserve) for the year 1910.........................................   111,819.02

On the credit side of the return:

(1) Deductions made by Commissioner from the reserve claimed permissible on account of deferred or supplementary contracts, also on account of lapsed or canceled policies............   958,220.94
    This covers both years.
(2) Difference between plaintiff's and Commissioner's valuation of policies (1908).........................................    38,687.38

And the case presents the controversy over the action of the Commissioner in adding to the one side, and disallowing as proper deductions from the other side, of the return, these items respectively.

The plaintiff is a mutual life insurance company, conducting its business upon what is known as the level premium plan; and with respect to its character, its plan of doing business, the practice relating to the fixing and collection of premiums, the origin and character of its income, the method and means of securing a fund applicable to its maturing obligations from year to year, the testimony in this case is in close accord with the facts stipulated in the case of Mutual Benefit Life Ins. Co. v. Herold (D.C.) reported in 198 Fed. 199 (pages 202, 203 and 204).   It will conduce to brevity to permit a reference to that case to stand for a narration of the pertinent facts.

[1]  The act under which the taxes in question were levied contains as specific provision the following:

"* * * Every insurance company now or hereafter organized under the laws of the United States, or of any state or territory of the United States, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such * * * insurance company, equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, joint stock companies or associations, or insurance companies, subject to the tax hereby imposed.

"Such net income shall be ascertained by deducting from the gross amount of the income of such * * * insurance company received within the year from all sources (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, including all charges such as rentals or franchise payments required to be made as a condition to the continued use or possession of property; (second) all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any, and in the case of insurance companies the sums other than dividends, paid within the year on policy and annuity contracts and the net addition, if any, required by law to be made within the year to reserve funds; * * * (third) interest actually paid within the year on its bonded or other indebtedness, etc.; * * * all sums paid by it within the year for taxes, etc.; (fifth) all amounts received by it within the year as dividends upon stock or other corporations, joint stock companies, or associations, or insurance companies, subject to the tax hereby imposed. * * *"

Obviously, in the pecuniary aspects of the case the important question, both to the government and to the plaintiff company, is that arising on the Commissioner's inclusion of dividends as income. On behalf of plaintiff, the general contention is that they are not in any sense dividends arising as a profit in a business venture, but are in truth, obediently to the plan which is at the foundation of its business, an abatement to the policy holder of the excess premium as it may develop in the company's experience during the life of the policy; and the fact that they are carried upon the books of the plaintiff company and are disbursed as an ordinary dividend may be carried and disbursed is not at all relevant in determining their status, in view of the character of plaintiff's business and its legal and contractual relations with its members.

The question thus presented has been so thoroughly considered and determined in the case above referred to, as well as the other cases now to be cited, that it would savor of affectation to restate it, or attempt a consideration or elucidation productive either of greater clearness or any different result than that reached in such cases. Mutual Ben. L. Ass'n v. Commonwealth, 128 Ky. 174, 107 S. W. 802; Commonwealth v. Penn. M. L. I. Co., 252 Pa. 512, 97 Atl. 677; Commonwealth v. Metropolitan L. I. Co., 254 Pa. 510, 98 Atl. 1072; N. Y. Life Ins. Co. v. Chaves, 21 N. M. 264, 153 Pac. 303; Mutual Ben. L. Ins. Co. v. Herold, supra, 201 Fed. 918, 120 C. C. A. 256; Id., 231 U. S. 755, 34 Sup. Ct. 323, 58 L. Ed. 468; Conn. M. L. Ins. Co. v. Eaton (D. C.) 218 Fed. 206; Id. (D. C.) 218 Fed. 188 (two cases); Eaton v. Conn. General Life Ins. Co., 223 Fed. 1022, 138 C. C. A. 663.

Indeed, I feel that the question, having been considered by the federal courts in two different circuits, and a review thereof upon certiorari having been refused by the United States Supreme Court, should no longer be considered open. It may be observed, however, that in determining whether these "dividends" apportioned to policy holders, for application at their election to partial payment of renewal premiums or for the purchase of paid-up additions, are "income," considerations urged by the government are not relevant. Thus the suggestion that the great organization of the plaintiff, the expensive and costly attendants in the way of buildings and

the like, in fact the mere magnitude of figures exhibiting monetary and investment transactions, forbid classing it as an eleemosynary institution, is true. So, too, the similarity of method respecting receipt, holding, investment, and disbursement of money, with methods pursued by ordinary and other large business institutions, is patent. The maintenance of bank accounts, book accounts representing general funds, both made up through mingling receipts from various sources, the investment of funds regardless of their origin as premiums on policies or interest on existing loans, the payment of expenses, disbursements on policy contracts, dividends, out of a general fund or bank account, are referred to by defendant, and a summary of these matters is thus given by counsel:

"It appears without dispute that the company does not segregate its premium receipts, and that the excess or loaded portion thereof, out of which it claims to pay its dividends, is not segregated, either in the funds or the accounts of the company. As stated, the funds are mingled promiscuously; they are invested as chance offers, the returns all go into one fund, dividends are declared from all of its investments and returns from different sources, and, when paid, are paid out of this same general fund, not out of any fund set aside as a segregated 'excess cost' fund. At the end of the year, if business of the company has been managed with * * * sagacity, if its investments and loans have been wise, if it has been fortunate in experiencing a low death rate, it will have a profit or surplus. Like other corporations, it is then in a position to declare a dividend. If the business of the corporation for the years in question has not resulted in a profit or surplus, clearly the corporation could not have declared a dividend; the policy holder would have been entitled to none, but would have been obliged to pay his premium in full, or lapse his policy."

Now, when it is once conceded that the plan of insurance involves stipulation of a premium, which in turn involves assumptions, such as expectation of life, interest returns upon investment, expense or "loading," and also involves the undertaking ultimately to exact an actual premium which shall always approximate actual cost, it becomes quite immaterial by what name the difference between latter and such stipulated premium—if experience shall develop it—shall be called. The plan contemplates its return to the contributing policy holder.

If, therefore, in the working out of the plan, investments are made, funds received and disbursed, accounts created and kept, and a business organization is built up, all similar to those found in other large business ventures—if all this be done without evidencing from day to day, in precise terms of dollars and cents, each policy member's pro rata share of the difference or excess, the plan is none the less in existence, and the obligation to furnish insurance at cost is none the less in force, and with it follows the obligation, at some time, to remit any excess. Therefore, no matter how much the disbursement or application of this excess may, as between plaintiff and its members, resemble ordinary dividend disbursements, its real status is not thereby disclosed to be gain or profit in the sense that it is an increment upon the amount intended to be invested to secure insurance—for that intention was *cost*—and the obligation rests upon the insurance company at all times, not to endeavor to obtain returns upon a profit earn-

ing bases, but only such as assure the indemnity, and to abate the excess above indemnity cost.

[2] So, too, the fact that, in the ascertainment and apportionment of these dividends, the plaintiff acted obediently to section 1952 of the Statutes of 'Wisconsin, does not, in my judgment, either estop it, or avail against its contention. This statute, whatever change it may have wrought in respect of the elements to be considered and the method of proceeding in making up a balance sheet of insurance transactions, did not and does not, either create or modify the character or status of these disbursements on policies. And it is a matter of general knowledge that one of the main purposes of the section was, not to provide a rule or method theretofore unknown or unpracticed by insurance companies, but rather to withdraw from them the practically unlimited and unrestrained discretion which they had asserted with respect to the time when these apportionments were to be made. It is not only consistent with the plaintiff's contention respecting its plan of insurance, but from the standpoint of the policy holder it furthers such plan, by making ascertainment and remission of the excess mandatory, annually. It withdraws from the companies a discretion, which formerly was entertained and exercised, to withhold such ascertainment and disbursement or remission for long periods—during the whole policy period. But it declares nothing as to these dividends which gives them a character or status different from what they had prior to its enactment, or what they would now have, in its absence. .

If, as frequently happens in corporate or partnership affairs, the case presented the question whether profits had been earned, the acts of the governing body or of the partners, in making application of funds as dividends to shareholders, as profits to partners, might be persuasive in determining the debated question; and in the present case, if the sole question were the right to deduct these dividends from the income, as the company contends it should be returned, it obviously would require a negative answer, for the statute precludes deduction of dividends out of income; but the burden resting upon the government is greater than this. It involves the proposition that these dividends must be treated as income not subject to deduction. And when it is shown that they are derived from interest and premium receipts already included in a return for a preceding year, it is but a duplication, pro tanto, of the taxable income, to include them on the debit side of the return, and, if deduction be not permitted, the tax is really imposed on a disbursement.

[3] The contention of the government that the return should include, for purposes of taxation, premium and interest items accrued and due, but not actually collected and received, cannot be better answered than in the language of the Herold Case, where, in quoting the act, it is said:

"This language seems clearly to indicate that the net income, which is the measure of taxation, means what has actually been received, and not that which, although due, has not been received, but its payment for some reason deferred or postponed. Furthermore, an examination of the act shows that the net income is to be ascertained by deducting from the gross income:

(1) 'All the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties.' (2) 'All losses actually sustained within the year,' etc.; 'also the sums other than dividends paid within the year on policy and annuity contracts, and the net addition, if any, required by law to be made within the year to reserve funds.' (3) 'Interest actually paid within the year on its bonded and other indebtedness,' etc., 'and in the case of a bank, banking association or trust company, all interest actually paid by it within the year on deposit.' (4) 'Also all sums paid by it within the year for taxes,' etc. (5) 'All amounts received by it within the year as dividends upon stock of other corporations, joint-stock companies, or associations, or insurance companies, subject to the tax hereby imposed.' Since, then, the language of the act is explicit in permitting only such deductions from the gross income as were actually paid during the current year, it would be strange, indeed, if on the opposite side of the account the company were charged with what it had not received during the current year. No reason appears or has been suggested for so radical and unwarranted a departure. Furthermore, the word 'income' means, as already shown, that which has come in, and not that which might have come in, but did not. If expenditures means what has been paid out, or outgoes, then income means what has come in, or receipts."

In other words, the evident purpose of the act is to impose the tax, or to measure it, by a reference to benefits on the one and burdens on the other side, but such only as have been actually enjoyed or sustained, respectively. And, when this view is entertained, the suggestion that the law aims to impose an excise rather than an income tax is quite immaterial; for, conceding that, the ascertainment of "net," as against "gross," "income," as the measure of the excise, is still necessary; and the sense in which these terms are used is not more readily nor accurately determined by calling the imposition an excise, instead of an income, tax.

[4] A further controverted item arises out of the rejection by the commissioner of $958,220.94, claimed by plaintiff as a deduction. The facts are: The parties are not in disagreement respecting the deductions or the reserve liability of plaintiff in policies valued by the state insurance commissioner, which he conceives it his duty to value under the Wisconsin law. They are policies said to involve "life contingencies." But plaintiff has obligations on policies which are termed "supplementary contracts." They present this feature: When a policy holder dies, and the beneficiary exercises an option to take the avails of the policy in installments, the general reserve fund is charged with the fixed liability—the sum is withdrawn therefrom and set aside to take care of the liability according to the deferred term covered by the option.

Now the government contends that because the state insurance commissioner does not include these supplementary contracts in his "valuation" of outstanding policies, they can form no basis of a "reserve" carried for their security and deferred liquidation. The Wisconsin statute requires plaintiff to "hold funds properly and safely secured to provide for its reserve liability over and above all its other liabilities, which reserve liability shall be determined by the state as follows." St. 1915, § 1950. The act gives specifications for valuation of various kinds of policies, and casts upon the insurance commissioner the duty of making annually "valuations of all outstanding policies, additions

thereto, and other obligations of every such company mentioned in subsection 1 (supra)."

If there were no testimony disclosing the uniform practice of insurance companies, the plaintiff included, of carrying reserves to protect these supplementary contracts, of treating such contracts as exhibiting a reserve liability, the statute still indicates a quite clear intent to embrace all policy liabilities whose period of liquidation is deferred until the contingency of death or until the expiration of such time thereafter as the policy may, at the option of some one, fix. The mere fact that, by the contingency of death, the policy liability is removed from the range of valuation by one of the methods, or upon one of the bases, fixed by the statute, does not justify the conclusion that there can be or is no reserve liability, as that is known in the insurance business, in or on these supplementary obligations. Granting that section 1950 of Wisconsin Statutes lends plausibility to the contention of the government by reason of its failure to mention specific policies whereon the liability has become fixed, and therefore beyond the necessity for resort, in "valuation," to a mortality table, "assumed" interest rate, or "expense" item, yet the fact that the commissioner of insurance is by the same statute required to "value" "all outstanding policies, additions thereto, and other obligations" of mutual companies; further, the deferred character of the obligation found in these supplementary contracts; and, lastly, the uniform concurrence of practice among insurance companies in treating them as subject to the reserve protection—these, clearly, justify a finding accordingly, and warrant the inclusion of these contracts as embodying reserve liability in the calculation of the annual "net additions to reserve" which may be deducted from gross income.

[5] With respect to the necessity of returning as part of the gross income, such interest as accrues on "policy loans," the settled view that such loans and the interest are in no just sense obligations which the policy holder is bound personally to liquidate, with interest, must prevail. In Assessors v. N. Y. Ins. Co., 216 U. S. 517, 30 Sup. Ct. 385, 54 L. Ed. 597, it is thus expressed:

"When the plaintiff's [the insurance company's] policies have run a certain length of time and the premiums have been paid as due, the plaintiff becomes bound ultimately to pay what is called their reserve value, whether the payment of premiums is kept up or not, and this reserve value increases as the payments of premiums go on. A policy holder, desiring to keep his policy on foot and yet to profit by the reserve value that it has acquired, may be allowed at the plaintiff's discretion to receive a sum not exceeding that present value, on the terms that on the settlement of any claim under the policy the sum so received shall be deducted with interest (the interest representing what it is estimated that the sum would have earned if retained by the plaintiff), and that on failure to pay any premium or the above-mentioned interest, the sum received shall be deducted from the reserve value at once."

"This is called a loan. It is represented by what is called a note, which contains a promise to pay the money. But as the plaintiff never advances more than it already is absolutely bound for under the policy, it has no interest in creating a personal liability, and therefore the contract on the face of the note goes on to provide that, if the note is not paid when due, it shall be extinguished automatically by the counter credit for what we have called the reserve value of the policy. In short, the claim of the policy holder on the one side and of the company on the other are brought into an account current

by the very act which creates the latter. The so-called liability of the policy holder never exists as a personal liability, it never is a debt, but is merely a deduction in account from the sum that the plaintiffs ultimately must pay. In settling that account interest will be computed on the item for the reason that we have [above] mentioned, but the item never could be sued for, any more than any other single item of a mutual account that always shows a balance against the would-be plaintiff. In form it subsists as an item until the settlement, because interest must be charged on it. In substance it is extinct from the beginning, because, as was said by the judge below, it is a payment, not a loan."

A Wisconsin statute, although dealing with the matter of compulsory conversion of defaulted premiums into policy "loans," appears to give signal recognition, if not emphasis, to this characterization of such transactions, when it provides that such "loan" shall become due and payable "only when the total of all loans and interest shall be equal the reserve." Section 1948m, Wis. Stat.

[6] A final question, one not suggested in the pleadings, briefly referred to in oral argument, but later elaborately discussed in briefs, arises on these facts: In making its return for the year 1910, plaintiff omitted an item of $77,000 from the income side. It is an aggregate of receipts from agencies, omitted because information respecting the accounts to which individual items were distributable was not at hand at the time of making the return, and, apparently, was in good faith treated as a "suspense" item which would naturally, upon later ascertainment, go into the return for the ensuing year. There is no suggestion that the facts are not consistent with perfect good faith. The record attests fully that the omission, if it involved delinquency at all, arose as stated—it was an erroneous failure to include the items.

The government urges that such failure bars the right to maintain the action, and bases its contention upon section 3225, R. S. U. S. (Comp. St. 1916, § 5948), which is asserted to be incorporated into the excise law in question:

"When a second assessment is made in case of any list, statement, or return, which in the opinion of the collector or any deputy collector was false or fraudulent, or contained any understatement or undervaluation, no tax collected under such assessment shall be recovered by any suit unless it is proved that the said list, statement, or return was not false nor fraudulent, and did not contain any understatement or undervaluation."

The broad proposition is that any and every error of understatement or undervaluation, howsoever innocently made, bars relief against a reassessment, howsoever inaccurate, or unjust it may be. It may be said, confidently, that so drastic a rule should not be accepted unless unmistakably clear language, disclosing a legislative purpose and intent viewed in the light of history and results to be achieved, leaves no alternative.

I shall assume that section 3225 is brought into the tax law in question; and it necessitates consideration of that section as part of a chapter, dealing generally with practice, procedure, rights and remedies awarded to both government and taxpayer or citizen, in the matter of assessment, collection, remission, and refund of public dues. These laws are not of recent enactment. The times and conditions at

and under which they came into being to further the raising of reve-
nue to meet a situation of great national stress, the administrative
recognition and application accorded them for over 50 years, may
safely aid in throwing light upon the just interpretation to be given.
Without narrating historically the advent and amendment of this par-
ticular section 3225 and allied provisos, it suffices to say that they had
their beginnings in the Civil War Revenue Act of June 30, 1864
(13 U. S. Stat. p. 223, c. 173), as amended by the Act of July 13, 1866
(14 U. S. Stat. 98, c. 184). They exhibit the early recognition by the
government of the necessity of ways and means for revising, both in
the interest of the government and the taxpayer, the returns or as-
sessments made or levied, and for refunding or recovery of taxes ac-
tually paid; and from the earliest occasions when interpretation of
these statutes was called for the courts here have uniformly given to
the results accomplished by legislation on the general subject, this
broad characterization:

> "The revenue measures of every civilized government constitute a system
> which provides for its enforcement by officers, commissioned for that purpose.
> In this country, the system for each state, or for the federal government, pro-
> vides safeguards of its own against mistake, injustice, or oppression, in the
> administration of its revenue laws. Such appeals are allowed to specified
> tribunals as the lawmakers deem expedient. Such remedies, also, for re-
> covering back taxes illegally exacted, as may seem wise are provided. In
> these respects, the United States have, as was said by the court in Nichols v.
> United States, 7 Wall. 122 [19 L. Ed. 125], enacted a system of corrective jus-
> tice, as well as a system of taxation in both its customs and internal revenue
> branches. That system is intended to be complete. * * * So also in the
> internal revenue department, the statute allows appeals to the assessor to
> the Commissioner of Internal Revenue; and, if dissatisfied with his decision,
> on paying the tax the party can sue the collector; and if the money was
> wrongfully exacted, the courts will give him relief by a judgment, which the
> United States pledges herself to pay." Per Miller, Justice, Cheatham v. U.
> S., 92 U. S. 88, 23 L. Ed. 561.

A careful reading of adjudicated cases—indeed, all legislation upon
the varied phases of public revenues—suggests that at no time has
there been a purpose to cut off or to impair, either as against the gov-
ernment or the citizen, this "system of corrective justice" attending
the administration of revenue laws.

At the outset, the proposition advanced by the defense is repugnant,
utterly, to this view, and the broad purpose disclosed. If it is not ob-
viously, it is easily demonstrably so. A few considerations of a
practical nature—which a court may entertain—will be helpful.
When property is assessed for taxation upon an ad valorem basis,
the taxing officers frequently must, initially, determine values. Even
in such cases, the taxpayer is not left wholly remediless to review or
revise the finding of the assessing or taxing officer. In very rare
situations is it possible, justly, to ascribe to any individual, whether
he be the interested taxpayer or the public assessor, the power or the
duty to make an initial valuation to be accepted by the one adversely
interested, as indubitably fair; and, as indicated, there have arisen
of necessity, in the interest of just dealing, the varying methods of
revision and correction. Coming to the particular case before us,

where assessments are based upon returns exhibiting great magnitude and complexity of business operations, the possibility and the probability of errors—without a suggestion of attendant bad faith—is increasingly present. It may safely be said that the great majority of returns under these excise and income tax laws contain items involving for their fixing and determination, judgment, honestly and conscientiously exercised; and it is equally true that, no matter how conscientiously one man may fix and determine an item, another, with equal probity and integrity, may fix it at a substantially higher or lower figure. The very purpose is to enable revision, to correct the mistake, of omission or commission, or to prevent frauds; and it would be anomalous to assume infallibility on the part of the government in its efforts at revision, wherefore mistakes of the citizens only are to be corrected. This is said because, in my judgment, the drastic construction of section 3225, now insisted upon, will, if adopted, lead to that result as a matter of practical administration and application. It means that the taxpayer cannot prevail unless he succeeds in reinstating his own return, item for item, against the revision or reassessment. Naturally, suits to recover can rarely be brought when the reassessment is more favorable than the original return, though even such result can conceivably come through an entire rearrangement of the return through the exclusion of items admitted and the inclusion of items contested by the taxpayer. But this is true as a practical matter: Every reassessment, which results in an increased tax, must involve, expressly or by necessary implication, the opinion or conviction of the reviewing officer that the original return contained, somewhere or somehow, an understatement or undervaluation, a false (erroneous, or fraudulent) item or items. Therefore, unless the taxpayer can establish that his original return was right, and hence that the reassessment, in its attempted revision or additions, is wrong, in every particular, he must fail in his action. If this is possible, and it must follow so strict an interpretation of the statute (section 3225), then there is little left that can commend itself—to the citizen or taxpayer—of any so-called system of "corrective justice."

The present case furnishes a good illustration: Assuming that the exaction of 1 per cent. on the millions of dividends treated as income is illegal and unjust, a remedy would have to be denied because of an honest error respecting an item, by comparison, trifling. I am unwilling to give to the section in question any such interpretation; and, no matter how drastic an application may be compelled in cases of actual fraud—whether the items fraudulently withheld or misstated be large or small—the view that the section aims to furnish a rule of proof, to give to the finding of executive officers a status or dignity prima facie good, to cast upon the citizen the burden of overthrowing it, thereby giving the section a distinct place and function in the corrective and revisory "system" of the revenue laws, is far more reasonable and commendable. It furthers the accomplishment, by the government or by the taxpayer, of the general purpose of enabling just revision or recovery; whereas, the view urged by the defendant makes the statute highly penal, and, in its application, one-sided, re-

sulting, as indicated, in foreclosure of recovery in every case where the original return cannot be established, item for item, in opposition to the government revision.

The views thus expressed entitle plaintiff to judgment, and the findings proposed on its behalf will be signed, whereupon judgment in its favor may be entered.